**LANGER, Terry, M.D. and Langer, Joan, Appellants,**

v.

**MONARCH LIFE INSURANCE COMPANY, and Presbyterian–University of Pennsylvania Medical Center.**

No. 89–1053.

United States Court of Appeals, Third Circuit.

Argued May 31, 1989.

Decided July 6, 1989.

Alan M. Lerner (argued), Vernon R. Byrd, Stephen V. Yarnell, Linda A. Perlmuth, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, Pa., for appellants.

Thomas A. Masterson (argued), Jami Wintz McKeon, William P. Quinn, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee Presbyterian–University of Pa. Medical Center.

---

**1.** I join in parts I, II, and III of the court's opinion.

Before GREENBERG and HUTCHINSON, Circuit Judges and RODRIGUEZ, District Judge.*

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This appeal concerns the meaning of the disability insurance provision of the employment contract between Doctor Terry Langer, the plaintiff,[1] and the Presbyterian–University of Pennsylvania Medical Center (the Medical Center). On December 13, 1985, while Langer was employed by the Medical Center, he suffered a disabling stroke. At that time he was not covered by the disability insurance policy provided for in his employment contract, an omission which ultimately triggered a dispute regarding his entitlement to the disability benefits from the Medical Center. The district court concluded that the employment contract unambiguously placed the burden of obtaining the insurance on Langer and that, consequently, the Medical Center had no obligation to him other than to pay the premiums if he obtained the insurance. Thus, in this action in which Langer has sought to have the Medical Center held responsible for the disability payments as they accrue, the district court granted summary judgment in its favor. Because we conclude that the contract did not unambiguously place the risk of loss on Langer if the insurance was not obtained, we will reverse and remand.

## I. BACKGROUND

### A. *Contract Formation*

In the spring of 1985, Langer, who was 45 years old, was a medical doctor serving on the faculty of the University of Pennsylvania Medical School and on the staff of the Hospital of the University of Pennsylvania (HUP). Unquestionably he was, as the district court described him, "a world renowned cardiologist with an immense and lucrative practice." *Langer v. Presby-*

*terian–University of Pennsylvania Medical Center*, No. 87–4000, slip op. at 1, 1988 WL 81728 (E.D.Pa. Aug. 1, 1988). While he had suffered a heart attack in the summer of 1983, by 1985 he had recovered from it.

In the spring of 1985, Dr. Richard H. Helfant, Chief of Medicine of the Medical Center, contacted Langer and suggested that he leave HUP to join the medical and teaching staff of the Medical Center as its Chief of Clinical Cardiology. This approach led to negotiations between Langer and the Medical Center which continued during the summer of 1985. It is apparent that the Medical Center was not merely recruiting a doctor. Rather, it anticipated that it would hire both Langer's HUP secretary and a nurse practitioner selected by him, and would reorganize its staff to provide him with additional support. Langer was expected to "have responsibility for the Cardiology Training Program including the Fellowship, House Staff and Medical Student programs as well as being responsible for matters regarding cardiac patient care." As Helfant explained in a letter of August 14, 1985, "my plan and goal is for you [Langer] to assume the key position as both magnet doctor and role model in the forefront of our plan to become a leading center of excellence."

No later than June 1985, Robert Bauer, the Medical Center's Chief Financial Officer, became involved in its recruitment of Langer. Bauer arranged for consultants from Coopers and Lybrand, a major accounting firm, to prepare projections comparing the Medical Center's offer with the terms of Langer's position at HUP.

In an attachment to an August 14, 1985, letter to Langer, the Medical Center outlined "Benefits to be Provided to Dr. Terry Langer by Presbyterian–University of Pennsylvania Medical Center." The three provisions dealing with insurance coverage stated:

1. *Health Insurance*

---

* Honorable Joseph H. Rodriguez, United States District Court for the District of New Jersey, sitting by designation.

1. Langer's wife, Joan Langer, was a plaintiff because of a claim for loss of consortium. This claim was subsequently dismissed and is not presented on this appeal.

Comprehensive coverage for you and your family. All pre-existing condition clauses will be waived.

2. *Disability*

Double your present coverage. We understand this will result in coverage of approximately $270,000 per year.

3. *Life Insurance*

We would pay for an amount equal to your present coverage ($557,500) plus an additional $1,000,000.

Langer asserts that this memorandum was prepared for use at a meeting on August 15, 1985, at which the final terms of his employment by the Medical Center were drafted.

### B. *Contract Terms*

By letter dated August 21, 1985, Helfant outlined the terms of the Medical Center's offer of employment to Langer as its Chief of Clinical Cardiology, including his salary.[2] The letter stated that "[i]n addition to this salary, you will receive all of the benefits outlined on Attachment I."

Attachment I was entitled "Benefits to Be Provided to Dr. Terry Langer by Presbyterian–University of Pennsylvania Medical Center," and its second paragraph was captioned "Disability." It added a sentence to the preliminary terms as set forth in the August 14, 1985, letter and provided as follows:

Double your present coverage. We understand this will result in coverage of approximately $270,000 per year. We agree to 'gross-up' payments to provide you with sufficient after tax dollars to purchase this coverage (the 'gross-up' will be calculated on the basis of your marginal federal tax rate plus applicable state and city income taxes).

On August 23, 1985, Langer accepted the Medical Center's offer. Thus, the disability insurance provision in the attachment to the August 21, 1985, letter became part of his contract.

### C. *Post–Contract Performance*

At a meeting on September 25, 1985, Bauer asked Robert Hardin, the Medical Center's Administrator of the Department of Medicine, who had not been involved in the recruiting, to assist in making arrangements for Langer's move from HUP to the Medical Center. In particular, they discussed Langer's insurance coverage. Hardin contacted an insurance broker, Gabriel Agins, and learned that at least one company, Monarch Life Insurance Company, was willing to consider an application for disability insurance but only for a policy with a maximum annual benefit of $204,000 rather than $270,000. Accordingly, by application of October 28, 1985, signed by Langer, a disability insurance policy on his behalf was sought from Monarch. We are not certain, however, who prepared the application or delivered it to Monarch.[3]

On or about November 1, 1985, in accordance with his employment contract with the Medical Center, Langer left HUP and began employment with the Medical Center. However, on December 13, 1985, Langer suffered the stroke which paralyzed him on his left side and he has not since served as Chief of Clinical Cardiology. At the time of the stroke, the application for disability insurance with Monarch was still pending but it was subsequently rejected.

On January 20, 1986, Hardin wrote to Philip Weiss, Langer's attorney, stating "the disability policy has been denied by the life insurance company (Monarch Life) and therefore the disability coverage will be provided via the Medical Center itself. Commencement of this disability payment would be after a 90 day waiting period."

---

**2.** The salary to be paid Langer was only a minor portion of the income which it was contemplated he would earn at the Medical Center, as he also anticipated receiving substantial fees from his practice which was to be transferred there.

**3.** The Medical Center asserts that Langer, not it, "applied to Monarch for the contemplated disability coverage." Brief of Defendant–Appellee at 32. While this may be true, the Medical Center at least cooperated in the attempt to obtain the coverage, the cooperation including tendering a check for a premium in excess of $6,000.

On February 10, 1986, Hardin sent a memorandum to Richard Bennett, the Medical Center's Controller, which stated:

I have recently discussed Dr. Langer's situation with Philip Weiss, Attorney for Dr. Langer. In that discussion he asked how the Medical Center would be treating the disability income that Dr. Langer would be receiving should he still be disabled effective at the end of the 90 day waiting period (approximately March 15, 1986)? Mr. Weiss also asked whether the disability income would be reported through a W2 or some other methodology and would the income be taxable? (I assume so.) It would seem to me that it would be important to make sure that it is declared as a self-insured disability income by Presbyterian, so there would be no chance of the other disability policy becoming void.

Copies of the memorandum were sent to Bauer, Weiss and William Miller, Langer's accountant.

On April 15, 1986, Hardin sent a memorandum to Bennett, the germane portion of which stated:

Per my earlier memos to you relevant to Dr. Terry Langer's disability, I am requesting that the initial disability check be issued for Dr. Langer from Presbyterian. Specifically, Dr. Langer has exceeded the 90 day waiting period, which expired March 13, 1986 and he is now expecting an initial first month disability payment covering the period March 13—April 13, 1986.

As you know, the guaranteed disability income to Dr. Langer (per agreement with Presbyterian) was $270,000 per year. On a monthly basis this amounts to $22,500 per month. Since we were able to convert the disability policy that he had at HUP for $36,000 per year, the monthly amount due is reduced by the payment received of $3,000 per month. In other words, $22,500 less $3,000 per month gives a remainder of $19,500 per month. Therefore, there is a check now payable to Dr. Langer for this amount and I have been reminded of this by his office.

On April 17, 1986, Bennett wrote to Langer with copies of his letter being sent to Bauer, Hardin, and Helfant, that:

I have been requested by Bob Hardin to arrange for the appropriate payment to you for the period March 13 to April 13, 1986. In accordance with our agreement dated August 21, 1985, this payment amounts to $22,500, but will be reduced by the net pay you received from the Medical Center during that period of $2,193.24 and by the $3,000 received by you monthly from the insurance policy that is being paid for by the Medical Center. In future months, this payment will equal $19,500 until such time that you resume your position as Chief of Clinical Cardiology. These payments will be mailed to your above home address.

During the remainder of 1986 and the first quarter of 1987, the Medical Center made the monthly payment of $19,500 to Langer.

On March 11, 1987, I. Donald Snook, the President of the Medical Center, met with Langer. According to Langer, Snook told him that their contract was void and that the Medical Center was working on a tentative replacement contract. Langer maintains that this was the first notice he had that there was a difference of opinion as to the Medical Center's contractual liability to make disability payments to him.

On June 18, 1987, Snook wrote to Langer stating:

As you know, we have not yet reached agreement with you on the terms under which the Medical Center would continue its relationship with you after June 30, 1987.... As we have stated over the past few months, the Medical Center cannot continue to advance funds for your support without a clear understanding of your continuing relationship with the Medical Center on terms which it finds acceptable....

Regretfully, we must advise you that if such agreement cannot be reached by June 30, 1987, the Medical Center must reluctantly terminate your appointment as Chief of Clinical Cardiology with the Medical Center....

Although your responsibilities as Chief of Clinical Cardiology at the Medical Center would terminate on June 30, 1987, the Medical Center would continue all current financial support payments which it has been making to you during the month of July, and would further continue such payments at a 50% level during the month of August and at a 25% level during the month of September, with all such payments terminating thereafter. ... Although the Medical Center does not currently intend to seek recovery from you of support payments which have been made by the Medical Center to you since your stroke in December, 1985, the Medical Center reserves the right to reconsider this issue at a later date.

On June 29, 1987, Langer filed the complaint against the Medical Center seeking a judgment requiring a continuation of the disability payments. The complaint was subsequently amended and ultimately sought relief for additional alleged wrongs including wrongful discharge and intentional infliction of emotional harm. Monarch was also made a defendant but Langer and Monarch subsequently settled and it is no longer a party.[4]

On July 17, 1987, Snook wrote to Langer as follows:

I regret that you have decided to pursue litigation as a means of resolving your dispute with the Medical Center.... Despite the Medical Center's best efforts, we have been unable to reach a mutually satisfactory understanding, and you, by instituting litigation, have stated your preference to have the matter resolved by the courts.

Consequently, the Medical Center has determined that it must discontinue all payments to you, including all payments pertaining to your salary, rental obligations in the Medical Center ..., private practice assistance and educational benefits for your children. Moreover, the Medical Center ... hereby demands repayment of the $100,000 loan previously made to you, together with interest from the date of your termination....

Since March 15, 1986, the Medical Center has voluntarily made support payments to you totalling $312,000. All of the Medical Center's support payments have been made voluntarily and out of our concern for you and your family. However, in light of your decision to commence litigation, the Medical Center has determined that it would be inappropriate to make further payments. Unfortunately, you have also left us no alternative but to hereby demand your repayment of all of the support payments that the Medical Center has made to you since March 15, 1986.

No further disability payments were made to Langer. Rather, the Medical Center filed a counterclaim and ultimately sought repayment of $95,000 then due from Langer on the loan to him, referred to in Snook's letter of July 17, 1987, and $292,500 for its disability payments.

### D. *The Development of This Litigation*

On June 6, 1988, Langer and the Medical Center filed cross motions for partial summary judgment on, *inter alia,* the disability payments issue. On August 1, 1988, the district court filed an opinion and order ruling that the Medical Center was not responsible for further disability payments to Langer, though it could not recover the payments already made. Thus, it denied Langer's motion and granted that of the

---

4. Monarch and the Medical Center are parties to a related action in which Monarch has sought a declaratory judgment that it has no liability to the Medical Center and that its liability, if any, to Langer was extinguished by the settlement they reached. Following the *Langer* district court's denial of the motion to reconsider the summary judgment in favor of the Medical Center, the district court dismissed the declaratory judgment action as moot. Monarch appealed the dismissal and that appeal is presently pending before this court captioned *Monarch Life Insurance Company v. Presbyterian–University of Pennsylvania Medical Center and Terry Langer, M.D.,* and docketed under numbers 88–1870 and 88–1871. The Medical Center filed a cross appeal in that action. That appeal was stayed on

Medical Center.[5] Summary judgment was also granted the Medical Center on certain of Langer's other claims but others were left for trial, as was the counterclaim for the balance on the loan. In its opinion the court explained that the employment contract provision regarding disability insurance unambiguously supported the Medical Center's contention that it had no liability other than to pay Langer sufficient after-tax dollars to purchase any insurance he obtained. Langer subsequently moved for reconsideration of the order of August 1, 1988, and for leave to amend his complaint but on October 18, 1988, the district court denied these motions.

After a jury could not reach a verdict on the remaining issues, the parties then settled them. Accordingly, on January 5, 1989, the district court filed a final order dismissing the case. The order, however, preserved Langer's right to appeal from (1) the order of August 1, 1988, granting and denying the motions for summary judgment insofar as it denied his claim for disability payments; and (2) the order of October 19, 1988, denying his motion for leave to amend the complaint and denying reconsideration of the order of August 1, 1988.

Langer has appealed to the extent that his right to do so was preserved by the January 5, 1989, order. The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) and we have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

This appeal presents two issues: whether the district court erred in its disposition of the motions for summary judgment in denying Langer's claim for disability payments and whether it erred in denying Langer's motion to amend his complaint. We address the issues separately.

March 3, 1989, pending disposition of this appeal.

5. The form of order did not explicitly deny Langer's motion for summary judgment on the

### A. *Summary Judgment Was Improper On This Record*

■ We have plenary review over the district court's entry of summary judgment in favor of the Medical Center and its denial of summary judgment in favor of Langer. *See Metzger by and through Metzger v. Osbeck,* 841 F.2d 518, 519 (3d Cir.1988). The parties have briefed the summary judgment issues in this diversity case under Pennsylvania law which we thus apply.

In *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 (1986), the Pennsylvania Supreme Court stated that "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* at 201, 519 A.2d at 390. It further indicated that the determination of whether a contract is ambiguous is an issue of law resolved by the court. *See id.* at 201, 519 A.2d at 390.

Here we are concerned with the second paragraph of the attachment to the letter of August 21, 1985, outlining benefits. As we have already indicated, this paragraph is labelled "Disability," and provides:

Double your present coverage. We understand this will result in coverage of approximately $270,000 per year. We agree to 'gross-up' payments to provide you with sufficient after tax dollars to purchase this coverage (the 'gross-up' will be calculated on the basis of your marginal federal tax rate plus applicable state and city income taxes).

In summary, Langer contends that this provision required that the Medical Center obtain disability insurance for him and that if it did not do so, to act as his insurer. The Medical Center, however, contends that it was responsible solely for the payment to Langer of sufficient after-tax dollars to pay the premiums on such a policy and it was not obliged to obtain the insurance. These contrary readings of the disability provision are partially attributable to different interpretations of the term

disability payments issue but by granting the Medical Center's motion, the denial was implicit.

"purchase" as used therein. But neither proposed reading of the contract necessarily follows from the language used by the parties, as the agreement does not indicate who will be responsible to make the "purchase" and thus obtain the "coverage." [6] Additionally, the agreement makes no statement at all as to who will bear the loss if the coverage is not obtained. Thus, the contract is ambiguous.

Furthermore, even if the contract was not patently ambiguous, we would consider the parties' course of performance, and in light of that evidence conclude that it is latently ambiguous as to the party to bear the risk of loss if the insurance was not obtained.[7] In *Pennsylvania Engineering Corp. v. McGraw–Edison Co.*, 500 Pa. 605, 459 A.2d 329 (1983), the Pennsylvania Supreme Court stated that under its own "recent case law, 'course of performance is always relevant in interpreting a writing.' " *Id.* at 612, 459 A.2d at 332 (quoting *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 376 n. 6, 390 A.2d 736, 741 n. 6 (1978)); *see also* Restatement (Second) of Contracts §§ 202(4) & comment a, 212 & comment b (1981).[8]

A reasonable jury could conclude from the Medical Center's internal correspondence [9] and its letters to Langer and Weiss,

---

6. As we have already noted, *see supra* note 3 and the accompanying text, the record shows that the Medical Center at least participated in the post-contract efforts to obtain the insurance. For the reasons we set forth *infra*, regarding the effect of performance under a contract in the context of our consideration of the Medical Center's actions in making monthly payments, this conduct is evidence that the Medical Center was obliged to obtain the insurance.

7. A possible construction of the contract is that Langer was obliged to attempt to obtain the insurance, with the Medical Center responsible for the disability payments if he was unable to obtain it. In that event, if the absence of coverage was attributable to Langer's failure to seek it, the Medical Center might have been excused from making payments if Langer while not covered was disabled. Here, however, we are not *directly* concerned with the party charged with the physical duty to obtain the coverage because there is no suggestion by either party that there was no coverage because of a default by the other in its obligation *to attempt* to obtain it. Thus, the allocation of the duty to obtain the insurance is significant only to the extent that it relates to the decision as to which party suffers the loss because there was no insurance.

8. We do not overlook the Medical Center's argument that Pennsylvania law bars the use of extrinsic evidence to demonstrate a latent ambiguity in a contract; we simply reject its argument as a misreading of Pennsylvania law. The cases upon which the Medical Center relies deal with extrinsic evidence prior to or contemporaneous with the execution of the contract—the subjects of the traditional parol evidence rule. These cases do not bar the use of extrinsic evidence of events following the execution of the contract. Moreover, once consideration of post-execution extrinsic evidence demonstrates the latent ambiguity, parol evidence is admissible to assist the court in interpreting the contract. Accordingly, there is nothing internally contradictory in the following statement in *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986):

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. However, as this Court stated in *Herr Estate*, 400 Pa. 90, 161 A.2d 32 (1960), 'where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.' *Id.* at 94, 161 A.2d at 34.

*Id.* 513 Pa. at 200–01, 519 A.2d at 389–90 (citations omitted).

Thus, an ambiguity may be revealed by extrinsic evidence not barred by the parol evidence rule and once so demonstrated, evidence of intent which would otherwise be barred by the parol evidence rule is admissible. *See Pennsylvania Engineering Corp. v. McGraw–Edison Co.*, 500 Pa. 605, 609–13, 459 A.2d 329, 331–32 (1983); *Walton v. Philadelphia National Bank*, 376 Pa. Super. 329, 339, 545 A.2d 1383, 1388 (1988).

In its memorandum and order denying Langer's motion for reconsideration, the district court in considering the Medical Center's actions after Langer was disabled said: "In any case, the parties' post-contract dealings do not control the contract; the language of the document does. Plaintiffs have not pled that the parties may have modified its terms, after signing the document, and none of the evidence points to such a modification." This statement misconstrued the reason for evidence of performance under the contract, as it was produced not to show that the agreement had been modified but rather to demonstrate what the parties meant in the first place.

9. The correspondence between agents of a corporate party is within the scope of post-execution evidence which the Pennsylvania Supreme Court considers even when the contract at issue

that it acted as though it had a duty to provide disability insurance payments to Langer. Although the Medical Center now maintains that these substantial payments to Langer were gratuitous, the record does not demonstrate that the Medical Center ever expressed this understanding to Langer prior to his March 11, 1987, meeting with Snook.

On January 20, 1986, Langer was told that "disability coverage will be provided via the Medical Center itself," and copies of an internal memorandum of February 10, 1986, signed by Hardin, were sent to his attorney and accountant stating that the Medical Center should report these payments "as a self-insured disability income by Presbyterian." In an April 15, 1986, internal memorandum the payments to Langer were described as "guaranteed disability income to Dr. Langer (per agreement with Presbyterian)," and by letter dated April 17, 1986, Langer was told that the payments were "[i]n accordance with our agreement dated August 21, 1985," and that "[i]n future months, this payment will equal $19,500 until such time that you resume your position as Chief of Clinical Cardiology." Subsequently, Langer received payments from the Medical Center of $19,500 per month.

The Medical Center contends that this evidence of the parties' performance under the contract is not admissible because Hardin, who was involved in the making of the payments, had nothing to do with the formation of the contract. We, however, reject this contention. Hardin held the managerial position of Administrator of the Department of Medicine at the Medical Center and certainly was in a position to be aware of the Medical Center's understanding of its obligations, even though he may not have participated in their formulation. His notes indicate that on September 25, 1985, he was asked by Bauer, who had participated in negotiation of the agreement, to

assist by "facilitating the acquisition of a $1.5 million in Life Insurance and $270,000 annually in Disability Insurance." Furthermore, payments to Langer were made with the knowledge, and at least acquiescence, of the Medical Center's Controller, the Chief Financial Officer, the Administrator of the Department of Medicine, and the Chief of Medicine. We also point out that the payments were so very substantial and continued over so long a period that it could reasonably be inferred that they would not have been made if the Medical Center believed it could have avoided doing so.[10] Finally, we observe that until Snook raised the question of the Medical Center's responsibility, it never reserved the right to discontinue the payments.

The Medical Center also argues that the post-contract conduct is not relevant because it "is not consistent with Langer's proffered interpretation," Brief of Defendant–Appellee at 31, inasmuch as "there was *not* an 'uninterrupted course of performance by Defendant, which was entirely consistent with plaintiff's understanding' ". Brief of Defendant–Appellee at 31 (emphasis added). The Medical Center suggests three variations between its conduct and the proper conduct under Langer's interpretation of the contract. First, "[t]he monthly payments made by [the Medical Center] began three months after Langer became disabled". Brief of Defendant–Appellee at 31. Second, these payments "stopped fifteen months [after the first payment] (although Langer allegedly was still disabled)." Brief of Defendant–Appellee at 31. And, third, "the monthly payments amounted to $19,500 per month, without a gross-up to cover any tax liability, whereas, under Langer's interpretation of the contract, he is entitled to $22,500 per month plus a substantial 'gross-up' for taxes." Brief of Defendant–Appellee at 31–32.

is unambiguous. *See Pennsylvania Engineering Corp.*, 500 Pa. at 609, 459 A.2d at 331.

**10.** The district court in its opinion of August 1, 1988, said that the payments were made "for a

few months." We do not accept this characterization as it is undisputed that they were made for more than one year.

We reject this contention. The three-month delay in making the first payment to Langer was obviously designed to parallel the practice that an insurance company would follow under a disability policy. Indeed, the proposal from Monarch Life Insurance Company expressly provided that "[b]enefits will start after 90 days of total disability and are payable to you for your lifetime if disability begins prior to age 65." Thus, Hardin's January 20, 1986, memorandum to Langer's attorney explained that "[c]ommencement of this disability payment would be after a 90 day waiting period." In a February 10, 1986, memorandum to Bennett, the Controller, Hardin explained that he had received an inquiry from Langer's attorney who had "asked how the Medical Center would be treating the disability income that Dr. Langer would be receiving should he still be disabled effective at the end of the 90 day waiting period (approximately March 15, 1986)". Again, on April 15, 1986, Hardin wrote to the Controller that "Dr. Langer has exceeded the 90 day waiting period, which expired March 13, 1986 and he is now expecting an initial first month disability payment." Thus, the delay in the initial payment to Langer is consistent with Langer's interpretation of the contract as requiring the Medical Center to act as the insurer to the extent that he was not covered by $270,000 of disability insurance.

The Medical Center's second point, that it established its lack of responsibility to make the payments by its act of not making them, though it had done so for over one year, is so lacking in merit that we are constrained to say we are surprised it has been advanced. Langer promptly sued because the Medical Center indicated it would discontinue the disability payments. By that time the parties by their conduct had tended to demonstrate their understanding of the contract. The Medical Center could not by then breaching that understanding show what it meant.

The Medical Center's third point, that the variation between what it paid and what Langer thought was due, demonstrates that its conduct was not relevant to its liability, though not an insubstantial argument, cannot be the basis for a summary judgment in its favor. The parties agree that the contemplated disability insurance was $270,000 annually or $22,500 monthly. In fact, except perhaps for the first payment on which a salary offset was apparently taken, this is what Langer was paid, less a $3,000 credit from a disability policy with an insurance company. While the Medical Center points out that the contract provided for a gross-up for taxes, Langer was not entitled to this gross-up under his interpretation of the contract inasmuch as the disability insurance was not placed with an insurance company. Thus, there was no question of paying premiums with after-tax dollars. Accordingly, the Medical Center in failing to pay the gross-up was acting consistently with the contract.[11]

While it appears that the $3,000 credit predicated on the transfer of the policy from HUP should not have been taken, as the policy was not in fact transferred, and it further is evident that Langer acquiesced in this claim for a credit, this circumstance in no way undercuts the fact that the Medical Center was acting as though its gross obligation was to pay $22,500 monthly as Langer contends. Indeed, the fact that the Medical Center even considered it appropriate to claim a credit can give rise to an inference that it recognized its obligation to make the monthly disability payments.

It does not follow, however, from what we have said that Langer was entitled to summary judgment. First, as we have emphasized, the language of the disability provision is ambiguous. Second, Langer's post-contract actions are not wholly consistent with his interpretation of the contract. Specifically, it is unclear as to what his role was in applying to Monarch. Moreover, Langer asserted a right to recover against

---

**11.** The parties have discussed the taxability of the disability payments. We, however, will not. The contract says nothing about their taxability

Monarch which he settled without the participation of the Medical Center.[12] Third, the Medical Center presented parol evidence in support of its reading of the contract. Bauer, who negotiated the benefits package with Langer, testified in his deposition that he explained to Langer before there was a final employment agreement that the Medical Center did not want to be in the insurance business,[13] that he believed that the Medical Center would not have agreed to insure Langer if he proved to be uninsurable, and that the final language used in the contract provided that the sole obligation of the Medical Center "would be to pay sufficient after tax dollars to purchase any disability coverage that [Langer] could obtain."

Furthermore, while the parties' performance after Langer was disabled undoubtedly is a strong point in his favor, his acquiescence in the Medical Center's unwarranted $3,000 claim for a credit could be taken as a recognition by him that the Medical Center was not bound to pay anything at all and it would be wise to accept what he was getting on a voluntary basis. Overall, this conflicting evidence must be weighed by the jury rather than by the court on a motion for summary judgment.[14]

In view of the foregoing analysis, we conclude that the district court erred in granting summary judgment in favor of the Medical Center but did not err in denying Langer's cross motion for summary judgment. Accordingly, we will reverse the order of August 1, 1988, to the extent it granted summary judgment to the Medical Center and affirm it to the extent it denied summary judgment to Langer.

### B. *The Motion to Amend Must Be Reconsidered*

The final question before us is whether the district court erroneously denied Langer's motion to amend his complaint. Ordinarily, of course, we would review the order of denial only for an abuse of discretion. *See J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 613 (3d Cir. 1987). Here, however, we think that we should not make a substantive ruling on the issue. In its opinion of October 18, 1988, the district court indicated that it was denying the motion because Langer had lost at the "summary judgment level" and was, "on the eve of trial," attempting to "inject new life" into his case. The court concluded that "[t]o permit new causes of action to be asserted at this late juncture would prejudice defendant and render this court's summary judgment order irrelevant." In view of the subsequent developments in the case, we will remand the matter for reconsideration of the motion to amend, as we do not know whether the district court would have exercised its discretion in ruling on the motion to amend in the same way if it had not disposed of the disability claim by a summary judgment.

### III. CONCLUSION

The order of August 1, 1988, granting summary judgment to the Medical Center will be reversed. To the extent that the order denied Langer's motion for summary judgment, it will be affirmed. The order of October 18, 1988, insofar as it denied Langer's motion to amend, will be vacated. The appeal from the order of October 18, 1988, insofar as it denied Langer's motion for reconsideration, will be dismissed as moot to the extent that it sought reconsid-

and we are not concerned with that issue on this appeal.

12. We are uncertain as to the terms of the settlement and express no opinion as to what its legal effect may be on the rights of the parties.

13. At oral argument, however, counsel for the Medical Center admitted that it promised to waive all pre-existing conditions with respect to health insurance coverage for Langer and his family and that this waiver was easily accomplished inasmuch as the Medical Center self-in-

sured the health insurance coverage. In light of this concession, it appears that the Medical Center was already in the position of an insurer, albeit with respect to a different type of risk.

14. Indeed, in his reply brief, though he claims he is entitled to summary judgment in his favor, Langer indicates that "a new rationalization" advanced by the Medical Center "reveals that the contract is reasonably susceptible of different readings which conflict with one another." Reply Brief at 1.

eration of the summary judgment in favor of the Medical Center but will be affirmed to the extent that it sought reconsideration of the order denying Langer summary judgment. The matter will be remanded to the district court for further proceedings consistent with this opinion. Costs on this appeal will be allowed to Langer.