889 F.2d 1294
 Medicare&Medicaid Gu 38,269
WASHINGTON HOSPITAL and South Hills Health System and All
Saints Hospital and Lock Haven Hospital
and
Andrew Kaul Memorial Hospital (Intervenor in D.C.)
v.
John F. WHITE, Jr., Individually and as Secretary of the
Department of Public Welfare of the Commonwealth of
Pennsylvania; and Eileen Schoen, Individually and as Deputy
Secretary for Medical Assistance of the Department of Public
Welfare of the Commonwealth of Pennsylvania; and
Commonwealth of Pennsylvania, Department of Public Welfare.
Appeal of PHILADELPHIA GERIATRIC CENTER.
 No. 89-3209.
 United States Court of Appeals,
Third Circuit.
 Argued July 25, 1989.
Decided Nov. 24, 1989.
 
 Thomas A. Leonard (argued), James J. Rodgers, Charles E. Caniff, Jr., Jonathan J. Bart, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellant.
 Bruce G. Baron (argued), Asst. Counsel, Office of Legal Counsel, Dept. of Public Welfare, Harrisburg, Pa., for John F. White, Jr. and Eileen Schoen.
 Jane L. Dalton, Duane, Morris & Heckscher, Philadelphia, Pa., for amicus curiae The Hosp. Ass'n of Pa.
 Before GIBBONS, Chief Judge, HUTCHINSON, Circuit Judge, and WOLIN, District Judge.*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Philadelphia Geriatric Center (PGC) appeals the denial of its motion to enforce the terms of a court-ordered stipulation of dismissal entered in 1983 as well as the denial of its motion for reconsideration. Although PGC was not a party in the earlier litigation, it was a third-party beneficiary to the stipulated agreement supposedly settling the case. PGC claims that the 1983 stipulation "grandfathered" in a "new construction" exception to certain Pennsylvania Medicaid regulations governing reimbursement for nursing home care that had been in effect before the regulations were amended in 1981. The "new construction" exception would have allowed PGC's Sley Pavilion nursing facility to continue receiving the higher rate of reimbursement that the pre-1981 regulations allowed for new construction of additional nursing home beds whose construction the state had previously approved, apparently on the basis of need, as required by 55 Pa.Code Sec. 9424.7121, 8 Pa.Bull. 2828 (1978). PGC alleged that appellees, certain officials of Pennsylvania's Department of Public Welfare (DPW), violated the terms of the stipulation by discontinuing this higher rate of reimbursement after the 1981 amendments became effective and by seeking partial repayment for post-1981 reimbursements PGC has already received.
 
 
 2
 We hold that the 1983 stipulation is ambiguous on the "grandfathering" issue. Therefore, we will vacate the district court's judgment and remand this case to the district court to resolve the ambiguity in accordance with the intent of the parties. To do so, the district court, acting as a factfinder, must resolve the question of the parties' intent by interpreting the stipulation on the basis of relevant extrinsic evidence. Only thereafter can the stipulation be construed as a matter of law. In interpreting the parties' intent, relevant extrinsic evidence includes evidence of the parties' negotiations leading up to the stipulation.[1] It also includes any evidence of the parties' actions in the course of performing the stipulated agreement that sheds light on whether they intended to "grandfather" the former regulations' "new construction" exception into future regulations for hospitals named in the stipulated agreement. In particular, the information contained in the affidavit of Jane L. Dalton (Dalton), one of the attorneys involved in drafting the stipulation, should be considered if presented in accordance with other applicable evidentiary requirements.
 
 I.
 
 3
 PGC owns and operates licensed nursing home facilities in Philadelphia, Pennsylvania. In 1974, after specific regulatory approval, PGC finished constructing and began operating a new health care institute on its premises. The new construction included a 120-bed nursing home facility called the Sley Pavilion. The Sley Pavilion is designed to meet the needs of severely impaired patients who, in many cases, would otherwise occupy an acute care hospital bed.
 
 
 4
 About seventy percent of PGC's total revenues comes from Medicaid reimbursement by DPW, the state agency that now administers the federal Medicaid program within Pennsylvania. See Joint Appendix (App.) at 196. Pennsylvania has two reimbursement rates for patients entitled to nursing home care under Medicaid. The standard rate is paid for ordinary non-hospital based, freestanding nursing home care, and the significantly higher rate is available for nursing care in converted acute care beds in a hospital-based nursing facility. When the Sley Pavilion began operating, DPW and PGC reached an agreement concerning Medicaid reimbursement. Under that agreement, DPW recognized that up to one-half (sixty beds) of the Sley Pavilion's 120 beds qualified for the higher reimbursement rate, apparently because DPW determined that this number of beds was needed to provide the relatively high level of nursing care then thought to be associated with hospital-based facilities. The other half were classified under the lower rate allowed to ordinary freestanding nursing homes. In November, 1982, DPW unilaterally tried to change this agreement by reducing the number of beds that qualified for the higher reimbursement rate at the Sley Pavilion in the fiscal year ending June 30, 1981 to thirty, but the original sixty-bed figure was reinstated after PGC appealed to DPW's Office of Hearings and Appeals. See Washington Hosp. v. O'Bannon, No. 80-1106, slip op. at 3 (W.D.Pa. Feb. 22, 1989).
 
 
 5
 In the meantime, DPW had begun to enact a stricter nursing home classification scheme that reduced the hospital-based beds that qualified for the higher Medicaid reimbursement rate. Those hospitals that had beds qualified under the old system were not pleased, and in August, 1980 four Pennsylvania hospitals (not including PGC) brought suit in the United States District Court for the Western District of Pennsylvania against DPW and its Secretary and Deputy Secretary in Washington Hospital v. O'Bannon, No. 80-1106. This suit challenged, inter alia, the DPW rate-classifying regulations that had gone into effect on October 1, 1978. These regulations had seriously affected the Medicaid reimbursement the complaining hospitals received.[2] The hospitals alleged that these requirements unreasonably denied them hospital-based Medicaid reimbursement because none of them could satisfy the converted acute care bed requirement. In addition, the hospital plaintiffs sought relief on behalf of eighteen other hospitals (including PGC) that also might be excluded from higher Medicaid reimbursement rates because of the 1978 Regulations even though those eighteen presently qualified for the higher rates.
 
 
 6
 While this suit was still pending, DPW promulgated even stricter regulations. They went into effect on July 25, 1981. See 55 Pa.Code Sec. 1181.42 (1989).[3] The 1981 Regulations eliminated previously approved "new construction" from the facilities whose beds qualified for the higher hospital-based reimbursement rate, leaving only converted acute care beds in the class qualifying for the higher reimbursement. The 1981 amendments intensified the concerns of the hospitals involved in the Washington Hospital case.[4]
 
 
 7
 In November, 1983, the parties to the Washington Hospital litigation mutually agreed to a settlement and, in order to effectuate it, entered into a Stipulation of Dismissal that was also signed and approved by the district court. See App. at 258. The stipulation was drafted not only to benefit the parties, but also included terms that benefited other hospitals also providing nursing home care. Those other hospitals were listed in Appendices I and II of the stipulated agreement and included PGC. See paragraphs 4 and 5, App. at 260-61.
 
 
 8
 For almost three years after the Washington Hospital litigation was settled, DPW continued to reimburse PGC at the higher hospital-based rate. Then it started to take contrary steps. In 1986, DPW notified PGC that it would no longer get the higher Medicaid reimbursement rate for any services at the Sley Pavilion. App. at 206. On July 1, 1986, DPW began reimbursing PGC at the lower freestanding nursing home rate. The pressure increased as DPW delayed issuing PGC's audited Medicaid cost reports for fiscal years ending 1982 and thereafter, despite its obligation to process them within six months.[5] This effectively prevented PGC from appealing DPW's administrative reimbursement determinations to its Office of Hearings and Appeals, where PGC had already successfully contended that it was entitled to the higher reimbursement rate for services rendered in sixty of the Sley Pavilion's 120 beds in fiscal year 1981.
 
 
 9
 The audited cost reports were not finally issued until the fall of 1988, and then they reflected DPW's administrative determination that PGC was not entitled to the higher reimbursement rate for the Sley Pavilion after July 1, 1981, the beginning of fiscal year 1982. Consequently, DPW demanded that PGC reimburse it almost $1,900,000 for what DPW said were Medicaid overpayments PGC had received at the higher hospital-based rate for costs incurred at Sley Pavilion after July 1, 1981.[6] DPW demanded full repayment of this $1,900,000 by March 31, 1989. PGC responded with its motion in the district court to enforce the 1983 stipulation and to hold Secretary John F. White, Jr. and Deputy Secretary Eileen Schoen of DPW in civil contempt. Later, PGC also filed a motion for preliminary injunctive relief.
 
 
 10
 The district court, at a hearing on PGC's application for a preliminary injunction, heard the testimony of three witnesses and received exhibits. After the parties agreed that the record was sufficient to determine the merits of PGC's underlying motion to enforce the stipulation,[7] the district court, in an order entered February 22, 1989, denied PGC's motion to enforce and its request for a civil contempt adjudication with the limited exception of Medicaid payments received between July 1 and July 25, 1981. The district court based this order on its construction of the terms of the stipulation. See Washington Hosp. v. O'Bannon, No. 80-1106 (W.D.Pa. Feb. 22, 1989). The district court, construing paragraphs 4 and 10 of the stipulation together, held it "grandfathered" the "new construction" exception only until July 25, 1981, when the 1981 amendments to the regulations governing hospital-based nursing care reimbursement went into effect. Id., slip op. at 12-15.
 
 
 11
 After the court announced its decision, PGC moved for reconsideration and in support offered evidence on the parties' intent with respect to the "grandfathering" issue.[8] The district court denied the motion for reconsideration without opinion. App. at 1. PGC then appealed both the denial of the motion to enforce and the denial of the motion to reconsider to this Court.
 
 II.
 
 12
 We have jurisdiction over this appeal from these orders of the district court under 28 U.S.C.A. Sec. 1291 (West Supp.1989). The district court had subject matter jurisdiction over PGC's action under the terms of the 1983 court-ordered stipulation. Although a district court does not have continuing jurisdiction over disputes about its orders merely because it had jurisdiction over the original dispute, a stipulated agreement signed by the court does allow a district court to retain jurisdiction. See McCall-Bey v. Franzen, 777 F.2d 1178, 1188 (7th Cir.1985) ("[W]e have expressed no doubt of the power of a district judge to dismiss a lawsuit conditionally, retaining jurisdiction to effectuate the terms of settlement agreed to by the parties. Nor do we think there is any magic form of words that the judge must intone in order to make the retention of jurisdiction effective. All that is necessary is that it be possible to infer that he did intend to retain jurisdiction....").
 
 
 13
 We think there is little question that the district court retained jurisdiction to resolve allegations of non-compliance with the stipulated agreement. Paragraph nine of the court-approved stipulation states: "Plaintiffs will make no further effort to have their claims adjudicated or to request judicial relief upon those claims except insofar as questions or issues are raised: (1) by any failure of Defendants to comply with the terms of this Agreement...." App. at 263 (quoting p 9 in material part).
 
 
 14
 Paragraph nine cannot be read to limit the district court's jurisdiction to requests for relief identical to those sought by the plaintiffs in the original Washington Hospital suit. A court must be able to protect the integrity of a stipulation of dismissal that is functionally equivalent to a consent order or consent decree[9] when it has retained jurisdiction and a party alleges that another party is not obeying the terms of the agreement. See, e.g., Stotts v. Memphis Fire Dept, 679 F.2d 541, 557 & n. 16 (6th Cir.1982) (a court "has an independent duty to ensure that the terms of the decree are effectuated" and "to protect the integrity of its decree," especially upon motion of a party), rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Since PGC was asking the court to enforce the terms of this stipulation in the face of alleged non-compliance by the appellees, p 9 allowed the district court to properly assert jurisdiction in this matter.
 
 
 15
 We also think that PGC had standing to invoke that jurisdiction even though it was not a party to the original Washington Hospital litigation. Federal Rule of Civil Procedure 71 allows a non-party to enforce a court order in its favor just as a party could.[10] The district court does not lose jurisdiction merely because PGC may have other proceedings pending before DPW's Office of Hearings and Appeals. Accordingly, the district court had subject matter jurisdiction over PGC's motion to enforce and its motion for reconsideration.
 
 
 16
 The construction of the stipulation, including the question of whether it is ambiguous, is a matter of law over which we exercise plenary review. See United States v. Reader's Digest Ass'n, 662 F.2d 955, 961 (3d Cir.1981) ("construing the meaning of a consent order ... is a question of law for the court"), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); Thermice Corp. v. Vistron Corp., 832 F.2d 248, 252 (3d Cir.1987) (question of ambiguity is subject to plenary review). However, the legal resolution of any particular ambiguity in the stipulation's construction is not possible in the absence of factual findings by the district court as to what the parties intended the ambiguous provisions to mean. Hence, ambiguous provisions in the stipulation must be interpreted by the factfinder, here the district court, as an initial matter. Appellate review of those facts, when found, will of course be for clear error. See Fox v. United States Dep't of Hous. & Urban Dev., 680 F.2d 315, 319 (3d Cir.1982) (when controverted extrinsic evidence is required to interpret the meaning of an ambiguous provision, interpretation becomes a question of fact to be resolved by the factfinder). Finally, we review the district court's denial of PGC's motion for reconsideration for abuse of discretion. Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 348 (3d Cir.1986).
 
 III.
 
 17
 For our purposes, the 1983 stipulation can be treated as a contract. See Fox, 680 F.2d at 319 ("[a]lthough consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken"); Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119-20 (3d Cir.1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). It should be construed consistently with fundamental precepts of contract construction. See United States v. ITT Continental Baking Co., 420 U.S. 223, 236-38, 95 S.Ct. 926, 934-35, 43 L.Ed.2d 148 (1975); Sansom Comm. v. Lynn, 735 F.2d 1535, 1539 (3d Cir.) ("[c]onsent decrees are construed as contracts"), cert. denied, 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 358 (1984). In determining the meaning of the stipulation's provisions, initial resort should be to the "four corners" of the agreement itself, just as with contracts. See United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971) ("[T]he scope of a consent decree must be discerned within its four corners.... [T]he instrument must be construed as it is written....").
 
 
 18
 Here, however, the four corners of the stipulation do not resolve the issue. Read as a whole, the stipulation is ambiguous as to whether the parties to the original Washington Hospital litigation, acting in 1983, meant to avoid the requirements of 55 Pa.Code Sec. 1181.42(1) by "grandfathering" the "new construction" exception into the regulations for PGC and the other hospitals listed in Appendix I beyond the effective date of DPW's 1981 amendments eliminating that exception. In reaching that conclusion, we turn first to the language of p 4. It reads as follows:
 
 
 19
 The facilities listed in Appendix I [which includes PGC] have been determined, on a preliminary basis, to meet as of July 25, 1981, the regulatory requirement at 55 Pa.Code Sec. 1181.42(1) that hospital-based units must be composed of former acute hospital beds that have been converted to and certified for skilled nursing or intermediate care or the new construction exception to such requirement as set forth at 8 Pa.B. 2828 (1978). This determination has been made on the basis of information currently available to the Department, including declarations made by the facilities themselves. The parties agree that the Department may deny reimbursement at the hospital-based rate to any of these facilities should the Department determine, subsequent to the execution of this Agreement, that such facility does not actually meet the conversion requirement or the new construction exception. The parties further agree that any affected facility can challenge the factual basis for the Department's determination.
 
 
 20
 p 4, App. at 260-61 (emphasis added). The inclusion of the phrase "new construction exception" at two separate points in p 4 points towards its continuing application to these hospitals and is consistent with the goal of construing an agreement so as to give meaning to all of its words and phrases. See Rossville Salvage Corp. v. S.E. Graham Co., 319 F.2d 391, 395 (3d Cir.1963) (contract construction "which gives effect and meaning to a term is to be preferred over one which makes such term mere surplusage or without effect").
 
 
 21
 We note, too, that the use of the term "new construction exception" in the 1983 stipulation is itself misleading. It refers to the construction of nursing care beds undertaken by a hospital before DPW's 1978 change in the regulations significantly limited the higher reimbursement rate that the pre-1978 regulations generally allowed for beds like those at the Sley Pavilion. In this connection, it may be significant that the discussion of the "new construction exception" in the next to the last sentence of p 4 is in the present tense. The use of that tense seems to indicate that the parties thought the higher rate was still available to the hospitals listed in Appendix I in 1983, despite the 1981 change in the regulations deleting the so-called "new construction" exception.
 
 
 22
 Reading the stipulation to "grandfather" the "new construction" exception is further supported by the statement in p 4 that the facilities met DPW's regulatory requirements "as of July 25, 1981," the very date that the new regulations went into effect. On this date, the "new construction" exception no longer existed, except as preserved by the stipulation benefiting PGC and the other hospitals mentioned in Appendix I.
 
 
 23
 Nevertheless, p 4 is not dispositive on the "grandfathering" question. Other parts of the stipulation cast doubt on whether the parties intended to grandfather the "new construction" exception into Pennsylvania's Medicaid reimbursement program for hospital-based nursing homes and if so, the extent to which they intended to do so. Some of these other provisions could instead be read to imply that DPW retained the power to make adjustments to PGC's reimbursement rate in the course of administering Pennsylvania's Medicaid program after the date of the stipulation. Thus, p 10 states:
 
 
 24
 Defendants agree not to seek reimbursement from any hospital that is a party to or that adopts this Agreement to the extent that hospital was reimbursed according to the cost reimbursement ceilings governing payment to hospital-based facilities prior to July 25, 1981, on the grounds that such hospital failed to meet all of the requirements for reimbursement as a hospital-based unit. The Department otherwise may seek to recoup payments made to such hospitals as authorized by federal and state statutes and regulations.
 
 
 25
 p 10, App. at 263 (emphasis added). Moreover, p 8 provides:
 
 
 26
 This Settlement Agreement shall not be construed or interpreted to preclude the Department, its successors or any other Commonwealth agency from revising, amending, or repealing the regulations that are the subject matter of this Agreement, i.e., (the regulations currently set forth at 55 Pa.Code Section 1181.42) or any other regulations at any time or from taking such action as the Department, its successors, or any other Commonwealth agency may deem appropriate with regard to the Medical Assistance Program in general or the reimbursement of skilled nursing or intermediate care services in particular, as the Department, or its successors, or any other Commonwealth agency, in its discretion may deem appropriate....
 
 
 27
 p 8, id. at 262. These paragraphs must also be considered in determining whether the stipulation was meant to grandfather the "new construction" exception past its expiration date. See Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1131 (3d Cir.1969) (stipulation should be construed as a whole to give effect to all its provisions). When they are so considered, an uncertainty arises with respect to the continuing availability of the higher reimbursement rate the old regulation allowed PGC and the other hospitals listed in the stipulation.
 
 
 28
 The uncertainty thus created when these provisions are taken together leads us to conclude that the stipulation is ambiguous on the question of grandfathering. To be unambiguous, an agreement must be reasonably capable of only one construction. See Thermice Corp. v. Vistron Corp., 832 F.2d 248, 252 (3d Cir.1987); In re Barclay Indus., Inc., 736 F.2d 75, 79 (3d Cir.1984); Landtect Corp. v. State Mutual Life Assurance Co., 605 F.2d 75, 80 (3d Cir.1979). The stipulation here can be read in different ways with respect to the grandfathering of the "new construction" exception, depending on which of the conflicting paragraphs we emphasize. Indeed, if the parties did in fact intend what they called the "new construction exception" to grandfather hospitals listed on Appendix I into the higher hospital-based reimbursement rate at all, there are various ways in which they might have meant to extend the benefit of that higher rate to them. Without attempting to exhaust the possibilities, we note that they could have meant to extend the higher rate for the twenty-five days between July 1 and July 25, 1981,[11] when DPW's new regulations became effective; thereafter until DPW decided unilaterally to eliminate it; for the life of approved facilities built in reliance on it; permanently for the facilities listed in Appendix I; or for some other period. The language of the stipulation is not clear on any of these possibilities. The district court has not found the facts necessary to interpret the agreement with respect to these possibilities.
 
 
 29
 Since the stipulation is ambiguous on the grandfathering issue, the initial question before the district court was one of interpretation. It had to first determine the parties' intent by the ambiguous provisions in the light of all the evidence, including any available extrinsic evidence the parties might present. Instead, it erroneously held that the stipulation was not ambiguous on the issue of "grandfathering" and proceeded to construe it without first deciding the facts bearing on the parties' intent concerning continuing application of the "new construction" provision to PGC. See Washington Hospital, No. 80-1106, slip op. at 13-15 (W.D.Pa. Feb. 22, 1989).
 
 
 30
 Before the effect of this stipulation on PGC's right to continue to get reimbursement at the higher rate under the "new construction" exception can be determined, the parties' intent must be considered in order to properly interpret the conflicting implications of the stipulation's various material provisions. See Cooper Laboratories v. International Surplus Lines, 802 F.2d 667, 671 (3d Cir.1986) (construction "concerns itself with the legal operation of [an] agreement," while interpretation "requires an inquiry into what the parties intended, which is generally a question of fact"); Ram Constr. Co. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984) (making a similar distinction between construction and interpretation of an agreement). From any relevant evidence presented, the district court must find the facts upon which the parties' intent depends before it, or we, can construe the stipulation as a matter of law.
 
 
 31
 Accordingly, this case must be remanded, and the district court, as factfinder, should initially interpret the stipulation. During this process of interpretation, relevant extrinsic evidence may be introduced to help the court ascertain the intended meaning of the stipulation's ambiguous terms. See Fox, 680 F.2d at 319; Barco Urban Renewal Corp. v. Housing Auth., 674 F.2d 1001, 1007-08 (3d Cir.1982). To the extent such evidence is available, we believe that it is likely to prove helpful.
 
 IV.
 
 32
 Since factual development is necessary on remand, it is appropriate for us to comment generally on the types of extrinsic evidence relevant to interpretation of this stipulation. We note initially that the district court did correctly recognize that it should consider "the circumstances surrounding the formation of the Stipulation which may explain the 'meaning words used may have had to the parties....' " Washington Hospital, slip op. at 13 (W.D.Pa. Feb. 22, 1989) (quoting ITT Continental Baking, 420 U.S. at 238, 95 S.Ct. at 935). See also Fox, 680 F.2d at 320 ("language must be interpreted in accordance with its generally prevailing meaning unless the parties manifest a different intention or the words are technical").
 
 
 33
 In addition, though, the district court should also consider any material parol evidence the parties may produce about the negotiations that led to the stipulated agreement[12] as well as any material evidence they bring forth about the course of the agreement's performance[13] to the extent that evidence relates to the ambiguous terms in question. See ITT Continental Baking, 420 U.S. at 238 n. 11, 95 S.Ct. at 935 n. 11 (quoting Handler, Twenty-fourth Annual Antitrust Review, 72 Colum.L.Rev. 1, 23 n. 148 (1972)) (" 'Assuming that a consent decree is to be interpreted as a contract, it would seem to follow that evidence of events surrounding its negotiation and tending to explain ambiguous terms would be admissible in evidence.' "); Langer v. Monarch Life Ins. Co., 879 F.2d 75, 81 (3d Cir.1989) (parties' course of performance is relevant when writing is ambiguous); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 n. 8 (3d Cir.1980) ("the court sits with one purpose--to interpret through the use of objective indicia the intent of the contracting parties"). See also id. at 1010 (when the written agreement is not clear, "[e]xternal indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms").
 
 
 34
 For example, if PGC on remand timely offers the Dalton affidavit, which PGC claims will support its interpretation of the stipulation and show that both sides originally meant to grandfather the "new construction" exception, that affidavit should be considered as long as it meets other evidentiary requirements.[14] Of course, the district court should also give DPW a fair chance to present contradictory extrinsic evidence on the interpretation issue.
 
 
 35
 In deciding whether the parties intended the stipulation to grandfather the "new construction" exception past the expiration date of the regulation that contained it, the district court, as factfinder, will have to weigh the extrinsic evidence, judge its credibility and, as factfinder, draw from it whatever inferences are appropriate. Based on that evidence and any inferences properly drawn from it, the district court should find what the parties intended the stipulation to mean concerning continuation of the "new construction" exception. In turn, based on those findings, it can then resolve the ambiguity and decide whether the stipulation "grandfathered" PGC into the higher reimbursement rate because PGC had built the Sley Pavilion with the state's approval when that higher rate was available.
 
 V.
 
 36
 The district court's judgment will be vacated. The case will be remanded so that the district court can, consistent with this opinion, consider relevant extrinsic evidence in its interpretation of the stipulation with respect to the "grandfathering" issue. Only after the court has considered this evidence and interpreted the stipulation can the meaning of the ambiguous references to the "new construction" exception be determined.
 
 
 
 *
 Hon. Alfred M. Wolin, District Judge of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Because the stipulation is ambiguous, the parol evidence rule does not apply to bar evidence of the negotiations leading up to it. See note 12, infra
 
 
 [2]
 The relevant portion of the 1978 Regulations stated:
 Reimbursement under a separate statewide ceiling is available only to those hospital-based facilities meeting [certain non-material requirements] and the following additional requirements and conditions:
 (1) The hospital is utilizing former acute care hospital beds that have been converted to and certified for skilled nursing care and the need for the skilled beds has been approved by a local health planning agency. However, separate reimbursement may be available to a hospital that constructs new skilled nursing beds if the need for the beds is determined by the local health planning agency and approved by the State Health Coordinating Council of the Department of Health.
 * * *
 
 
 [55]
 Pa.Code Sec. 9424.7121, 8 Pa.Bull. 2828 (1978)
 
 
 [3]
 The 1981 Regulations provide, in relevant part:
 In addition to [certain unrelated requirements], hospital-based nursing units shall meet the following requirements:
 (1) The nursing unit must be composed of former acute care hospital beds that have been converted to and certified for skilled nursing or intermediate care.
 * * *
 
 
 [55]
 Pa.Code Sec. 1181.42 (1989)
 
 
 [4]
 There is evidence that DPW's primary goal in promulgating the 1981 Regulations was to discourage future new construction of nursing home beds by hospitals. In its answer to an interrogatory, DPW's counsel stated that DPW had enacted the 1981 changes because "it no longer wishes to encourage new construction of [nursing home] beds by hospitals." App. at 175
 
 
 [5]
 During these years, DPW was required to audit timely-filed cost reports within six months. See 55 Pa.Code Sec. 1181.74, 11 Pa.Bull. 2617 (1981). It is undisputed that PGC filed its cost reports seeking the higher rate of reimbursement in a timely manner
 
 
 [6]
 Testimony before the district court showed that DPW's auditor, Charles Chiampi, did not consider any effect the 1983 stipulation may have had on PGC's Medicaid classification status. Instead, he concluded that PGC could not qualify for higher Medicaid reimbursement rates based on his determination that PGC was not a distinct-part unit, was not composed of converted acute care beds, and did not meet certain occupancy requirements. App. at 232-33. PGC argues that, in light of the 1983 stipulation and its earlier agreement with DPW, which was upheld by DPW's Office of Hearings and Appeals for the fiscal year ending June 30, 1981, it did meet all three of these requirements and should have been eligible for higher reimbursement rates
 
 
 [7]
 At the hearing, PGC presented only limited evidence on the meaning of the 1983 stipulation with respect to "grandfathering" the pre-1981 provision for the higher rate to previously approved new construction. PGC's two witnesses presented mainly evidence of its dire financial straits, and DPW's witness--its auditor--testified about the basis for his audit's findings
 
 
 [8]
 Specifically, PGC offered an affidavit from Dalton, who was one of the counsel in the earlier Washington Hospital litigation and who was involved in negotiating the 1983 stipulation with DPW. See App. at 4-95
 
 
 [9]
 The 1983 stipulation was "so ordered" by the district court and thus had the same effect as a consent order or consent decree
 
 
 [10]
 Rule 71 reads (in relevant part):
 When an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the order by the same process as if a party....
 
 
 [11]
 This continuation was the meaning the district court attributed to the stipulation's references to the "new construction exception," when it incorrectly construed the parties' understanding as a matter of law. We hold it is, instead, only one possibility that must be sorted out from the others as a matter of factual interpretation on the basis of evidence bearing on the intent of the parties to the stipulation
 
 
 [12]
 This type of evidence is not barred by contract law's parol evidence rule because it can be introduced to properly interpret an ambiguity in the stipulated agreement. As we stated in Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001 (3d Cir.1980):
 Though the concept of the Parole [sic] Evidence Rule is relevant here, the issue in this case really concerns an exception to that rule. In the instant case one party introduced extrinsic evidence to "interpret" the contract. The other party argues that this extrinsic evidence seeks to vary or add to the contract and is therefore not admissible. If the written contract is unambiguous, the Parol Evidence Rule ... bar[s] the use of extrinsic evidence for interpretation. If the written contract is ambiguous the Parole [sic] Evidence Rule does not prevent the use of extrinsic evidence to interpret the writing.
 Id. at 1010 n. 9. We were careful to distinguish the situation involving an ambiguity in the agreement's provisions, in which case relevant parol evidence may be introduced, from other situations where one side argues that an agreement does not fully integrate the parties' intentions and tries to introduce evidence that varies or adds to otherwise unambiguous written terms, in which case the parol evidence rule should bar its introduction. Id.
 
 
 [13]
 The evidence on this point in the current record is somewhat conflicting, but we cannot tell what will be developed on remand
 
 
 [14]
 Considering PGC's initial willingness to have its motions adjudicated on the limited evidence presented, we do not believe, nor mean to imply, that the district court abused its discretion in refusing PGC's motion for reconsideration either to the extent that motion was based on the Dalton affidavit or otherwise. Instead, we remand the case because the district court erred in its initial holding that the stipulation was not ambiguous on the extent to which the parties intended to grandfather in the "new construction" exception's continuing application to PGC and the other hospitals listed in Appendix I as beneficiaries of that exception