Terry LANGER, M.D. and Joan Langer

v.

MONARCH LIFE INSURANCE COMPANY, and Presbyterian Medical Center of Philadelphia

MONARCH LIFE INSURANCE COMPANY

v.

PRESBYTERIAN MEDICAL CENTER OF PHILADELPHIA, and Terry Langer, M.D.

Terry Langer, Appellant in Nos. 90–1965, 90–1966, 91–1086 and 91–1087,

Monarch Life Insurance Company, Appellant in Nos. 90–1925, 90–1927, 91–1084 and 91–1085,

Presbyterian Medical Center of Philadelphia, Appellant in Nos. 90–1924, 90–1926 and 91–1052.

Nos. 90–1924 to 90–1927, 90–1965, 90–1966, 91–1052 and 91–1084 to 91–1086.

United States Court of Appeals, Third Circuit.

Argued Aug. 6, 1991.

Decided June 11, 1992.

Rehearing and Rehearing In Banc Denied July 9, 1992.

Alan M. Lerner (argued), Stephen V. Yarnell, Vernon R. Byrd, Loretta T. Grennon, John F. Licari, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, Pa., for Terry Langer.

Stephen S. Phillips (argued), James M. Beck, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Monarch Life Ins. Co.

Thomas B. Kenworthy (argued), Jami Wintz McKeon, William P. Quinn, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for Presbyterian Medical Center of Philadelphia.

Before: BECKER, MANSMANN, and SCIRICA, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

These consolidated appeals in a diversity case involving Pennsylvania law arise from a bitter dispute concerning the obligations of Presbyterian Medical Center of Philadelphia ("Presbyterian") and Monarch Life Insurance Corporation ("Monarch") to pay disability benefits to Dr. Terry Langer. Presbyterian had lured Langer, a leading cardiologist, away from the Hospital of the University of Pennsylvania (HUP) with a lucrative contractual package, an important part of which, in view of Langer's medical history, was disability benefits. Although Langer and Presbyterian had sought disability insurance from Monarch, Langer was stricken with a disabling stroke before Monarch acted with finality on Langer's application, and Monarch subsequently denied coverage. Langer sued both Monarch and Presbyterian for disability payments, but subsequently settled with Monarch under a loan receipt agreement entitling Monarch to reimbursement if Langer obtains a sufficient recovery from Presbyterian. After that settlement, Presbyterian claimed, in a companion case, that if it is found liable to Langer, then Monarch is liable over to it under various equitable and legal theories.

Presbyterian appeals from a judgment of the district court for the Eastern District of Pennsylvania entered on a jury verdict finding Presbyterian contractually liable to pay Langer disability benefits. Presbyterian contends, among other things, that the district court erred in taking from the jury an important defense, namely that Presbyterian satisfied all or most of its obligations to Langer when Langer obtained, and Presbyterian paid for, disability insurance from Monarch. Presbyterian also asserts that the district court erred in granting summary judgment to Monarch in the companion case. The district court there held that Presbyterian's responses to requests for admissions under Federal Rule of Civil Procedure 36 destroyed the predicate for two of the hospital's claims against Monarch, that one claim was factu-

ally insupportable, and that another was moot in light of the jury verdict.

Langer and Monarch have also appealed. Langer contends that the district court erred in not molding the jury verdict to award him future disability benefits. Monarch asserts that the district court erred in failing to award it sanctions under Federal Rule of Civil Procedure 11 against Presbyterian's counsel. According to Monarch, the district court recognized that Presbyterian's counsel violated Rule 11 by filing procedurally improper cross-claims that resulted in a later-lifted default judgment against Monarch, but the court abused its discretion by not assessing any sanctions.

We conclude that the district court erred in taking the issue of Langer's insurance with Monarch, and Presbyterian's theory that it was, at most, a "back-up insurer," from the jury. We will therefore vacate the judgment for Langer and remand for a new trial. We also hold that Presbyterian's judicial admissions did not justify the district court's award of summary judgment to Monarch against Presbyterian. We will therefore vacate the judgment for Monarch and remand for further proceedings on all but one of Presbyterian's liability-over claims. Finally, we conclude that the district court did not abuse its discretion in its handling of the Rule 11 motion, and will affirm its ruling on that issue. In view of these dispositions, we need not reach some of the subsidiary issues raised in these appeals, although we do dispose of a number that are likely to recur on remand.

I. FACTS AND PROCEDURAL HISTORY

In the spring of 1985, Presbyterian's Chief of Medicine, Dr. Richard H. Helfant, approached Langer, a 45–year-old cardiologist with a national reputation, and suggested that Langer leave his staff position at the Hospital of the University of Pennsylvania ("HUP") and bring his lucrative clinical practice to nearby Presbyterian (then known as the Presbyterian–University of Pennsylvania Medical Center). Langer had suffered a heart attack in the

summer of 1983, and although he had recovered by 1985, he remained particularly concerned about his disability benefits. Accordingly, disability benefits were an important part of the offering put together by Robert Bauer, Presbyterian's Vice President for Finance.

By July 1985, Presbyterian had agreed in principle to double the $135,000 annual disability coverage that Langer was then receiving under two policies at HUP. That offer appeared in letters dated July 23 and July 30, 1985, and in an attachment to an August 14, 1985 letter that outlined the benefits that Presbyterian would provide Langer. The August 14, 1985 offer letter was the most important because it served as the basis for discussions at an August 15, 1985 meeting at which Langer and Presbyterian tried to hammer out a final agreement. The relevant portion of Presbyterian's August 14, 1985 letter read:

2. *Disability*

Double your present coverage. We understand this will result in coverage of approximately $270,000 per year.

At the August 15, 1985 meeting, however, Presbyterian's benefits expert, Frank Raiti (of the accounting firm Coopers & Lybrand), noted that Presbyterian's existing group disability policy would not be sufficient to provide $270,000 in annual coverage, and that structuring the benefits that way would be disadvantageous tax-wise in any event. He therefore suggested that a better course would be for Langer to purchase disability insurance, and for Presbyterian to reimburse him for that amount plus an additional sum to cover the income taxes he would have to pay on the premium reimbursement.

The parties agreed—or so they thought. Bauer recalls that at the August 15, 1985 meeting he stated that he did not want Presbyterian "to be an insurance company." He further testified that he thought that Presbyterian was committing itself only to make premium payments, although he concedes that he never explicitly stated that if Langer was unable to obtain insurance he would be without coverage. Raiti and Langer's lawyer, Phillip Weiss, re-

called no manifestation of Bauer's qualms, however, and Langer apparently believed that Presbyterian was unconditionally offering to provide disability benefits.

At all events, in a letter dated August 21, 1985, Helfant outlined Presbyterian's revised offer to Langer, including salary, responsibilities, title, and benefits. The benefits were listed in a special Attachment I. The provision for disability benefits was identical to that contained in the August 14, 1985 letter, except that a crucial third sentence was added. Captioned "Disability," the paragraph read:

Double your present coverage. We understand this will result in coverage of approximately $270,000 per year. We agree to "gross-up" payments to provide you with sufficient after tax dollars to purchase this coverage (the "gross-up" will be calculated on the basis of your marginal federal tax rate plus applicable state and city income taxes).

On August 23, 1985, Langer accepted Presbyterian's offer, and Attachment I became part of the contract between them.

Some time in late September 1985, Helfant asked Robert Hardin, Administrator of Presbyterian's Department of Medicine and Division of Cardiology, to meet with Finance Vice President Bauer to facilitate Langer's transition to Presbyterian. Although Hardin had not been involved in the recruiting, he soon became the liason between Langer and Presbyterian. Hardin and Bauer apparently recognized that Langer's earlier heart attack might make securing disability coverage for him a difficult task. Hardin therefore contacted an insurance agent, Gabriel Agins, who knew of Langer's medical history and had arranged one of Langer's existing disability policies. Hardin hoped that Agins might be able to arrange an insurance package for Langer.

Agins agreed that it might be difficult to secure coverage for Langer. Agins suggested, however, that he might be able to arrange coverage for an amount *less* than $270,000 or for a short term (five years) rather than a longer term, and that in any case the coverage would probably depend

on the results of a current medical examination. Agins later informed Hardin that two insurance carriers had rebuffed Agins's inquiries on behalf of Langer, although Hardin apparently did not pass this information on to Langer. Agins eventually notified Hardin that Monarch would be willing to consider an application for long-term disability insurance, although only for a maximum annual benefit of $204,000. Langer underwent a physical examination, was reported to be an excellent risk, and signed an application for insurance from Monarch. Presbyterian thereupon sent a check to Monarch for the premium down payment, which Monarch deposited.

About this time (late October 1985), Hardin and Agins discussed Langer's application and the effect of the premium deposit, which Agins apparently described as a "binder." Based on his conversations with Agins, Hardin thought that the premium deposit covered Langer with a temporary insurance policy until Monarch acted on the application, although Hardin does not recall whether Agins explained what the term "binder" meant.[1] According to Langer's original complaint, Langer believed at that time that he was covered by insurance with Monarch.

On November 1, 1985, Langer formally left HUP and began working at Presbyterian. Unfortunately, on December 13, 1985, he suffered a major right parietal lobe stroke, which left him partially paralyzed on the left side. His speech and vision were impaired, and his mobility and strength were reduced. He remained hospitalized until February 1986. Although he has apparently not recovered fully, he has since resumed his medical practice.

At the time that Langer suffered the stroke, his insurance application with Monarch was still pending, apparently because Monarch had not yet received a chest x-ray required for approval of the application.

Agins was notified of Langer's stroke, although the record is unclear whether those at Monarch who were to consider Langer's application were made aware of the stroke. What is clear (and undisputed) is that in early January 1986, Agins informed Presbyterian that Monarch had rejected Langer's application. On January 15, 1986, Monarch returned the premium deposit to Langer, who deposited the check but reimbursed Presbyterian. Monarch took the position that Langer had no insurance when he was disabled, and therefore refused to pay him disability benefits.

On January 20, 1986, Hardin wrote to Weiss, Langer's lawyer, informing him that Monarch had denied Langer's application "and therefore the disability coverage will be provided via the Medical Center itself," commencing after a 90–day waiting period. On February 10, 1986, Hardin advised Bauer and Presbyterian's controller, Richard Bennett, that the payments to Langer should be treated as "self insured disability payments," in order to ensure that Langer's other disability policy would not become void. On April 15, 1986, Hardin wrote Bennett that "the guaranteed disability income to Dr. Langer (per agreement with Presbyterian) was $270,000 per year," and that Langer was owed payments for the period beginning March 13, 1986, the expiration date of the 90–day waiting period. Two days later, Bennett wrote Langer that "[i]n accordance with our agreement dated August 21, 1985," disability payments would commence.[2]

Presbyterian continued monthly payments from April 1986 through June 1987. During this time, Langer's recovery had progressed to the point where he began going to the office and seeing patients on a limited basis. In March 1987, however, I. Donald Snook, Presbyterian's President and CEO, told Langer that he considered their contract null and void because Langer

1. According to one standard definition, a binder is a "written memorandum of the important terms of [a] contract of insurance which gives temporary protection to [the] insured pending investigation of risk by [an] insurance company or until a formal policy is issued." *Black's Law Dictionary* 169 (6th ed. 1990).

2. Actually, Bennett agreed to provide Langer with only $19,500 per month while he was disabled, under the mistaken impression that Presbyterian had paid for a policy that was providing him with $3,000 per month.

was not fulfilling his duties. Snook also threatened to cut off the disability payments. The parties' continued discussions proved unfruitful, and on June 18, 1987, Snook wrote to Langer, notifying him that unless they could reach an agreement by June 30, 1987, the Medical Center would terminate his appointment. Snook also informed Langer that Presbyterian would phase out over three months the "financial support payments" that it had been making, although it would not seek recovery of past "support payments" at that time.

On June 29, 1987, Langer filed suit against Presbyterian. He claimed that Presbyterian had anticipatorily breached their contract and sought an order for continuation of the disability payments. In that lawsuit ("the *Langer* action"), Langer also joined Monarch as a defendant. Langer alleged that Monarch's acceptance of his insurance application and initial premium payment had created a temporary contract of insurance that covered him while Monarch was considering his application. Therefore, he claimed, Monarch had acted in bad faith by refusing to provide disability payments under the policy after proper request, and that it must begin current disability payments and make back payments.

On July 17, 1987, Snook wrote to Langer, stating that Langer's employment was terminated and that Presbyterian would discontinue all payments to him, including not only the "support" payments, but also salary, Langer's rent at the hospital, and educational benefits for his children. Additionally, Presbyterian sought repayment of a $100,000 loan and return of all disability payments made since March 15, 1986. On August 7, 1987, Presbyterian filed a counterclaim against Langer for those amounts; it did not, however, assert a cross-claim

against Monarch at that time. In the interim, on July 30, 1987, Langer had amended his complaint to seek damages from Presbyterian for wrongful discharge and intentional infliction of emotional harm. An October 15, 1987 amendment added Langer's wife as a co-plaintiff and included an additional claim for loss of consortium.

In November 1987, without advance notice to Presbyterian, Langer settled his claims against Monarch and moved, over Presbyterian's objection, to dismiss his complaint against Monarch. Under the terms of the settlement, Monarch "loaned" the Langers $10,000 per month, the "loans" to continue until Langer reached age 65 or died, or the Langers obtained a judgment from or a settlement with Presbyterian. Under the settlement, the Langers would only be obligated to repay the loans out of proceeds from the recovery from Presbyterian, if any; if the recovery was worth less than $2,000,000, the Langers would owe nothing and Monarch would continue to make payments to the Langers, but in lesser amounts.[3] Consistent with this settlement, Langer and Monarch became allies against Presbyterian in this litigation, although they hid the fact of settlement from Presbyterian during several crucial depositions of Langer in mid-November 1987, and concealed the details of the settlement from Presbyterian until February 1988.

On December 7, 1987, in response to the Langer–Monarch settlement, Presbyterian filed what it styled as a "cross-claim" against Monarch for subrogation, indemnity, and breach of contract. Presbyterian did not purport to amend its recent answer and counterclaims to Langer's amended complaint, nor did it seek leave of the court or the written consent of Langer or Monarch to file the "cross-claim." At a status

---

**3.** Presbyterian labels this settlement a "Mary Carter agreement." The term derives from *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.App.1967), and

> now is used rather generally to apply to any agreement between the plaintiff and some, but less than all, defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in

> some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants.
>
> *Black's Law Dictionary* 974 (6th ed. 1990). We need not detail the criticisms of Mary Carter agreements, see, for example, Note, *It's a Mistake to Tolerate the Mary Carter Agreement,* 87 Colum.L.Rev. 368 (1987), nor need we decide here whether this was a Mary Carter agreement, or what legal results that would entail.

conference before the court that day, counsel for Monarch orally (and correctly) informed counsel for Presbyterian that the "cross-claims" violated the Federal Rules of Civil Procedure, although Monarch did not formally respond to them. On December 31, 1987, Presbyterian caused a default judgment to be entered against Monarch on the "cross-claims." Only then did Monarch move to strike the "cross-claims" and to open the default. Not until March 3, 1988 did Presbyterian seek leave to amend its answer and include cross-claims.

The district court addressed the Presbyterian–Monarch procedural tempest on April 5, 1988. It denied Presbyterian's motion to amend, lifted the default, and struck the "cross-claims." It noted that Presbyterian's conduct "prima facie" called for Rule 11 sanctions but deferred a final ruling. On the same day, the court granted Langer's motion to dismiss Monarch from the action pursuant to their settlement.

In the meantime, on February 10, 1988, Monarch had filed a separate suit against Presbyterian. That suit ("the *Monarch* action") sought a declaratory judgment that Presbyterian had no valid claims against Monarch. Presbyterian then asserted its erstwhile "cross-claims" in the *Langer* action as counterclaims in the *Monarch* action. Presbyterian essentially averred that if it was liable to Langer, Monarch was "liable over" to it under equitable principles and because Presbyterian was a third party beneficiary of the insurance contract that Langer had with Monarch. The district court consolidated the *Langer* and *Monarch* actions for discovery and trial.

In June 1988, the parties filed various motions for summary judgment. On August 1, 1988, the district court ruled in the *Langer* action that Presbyterian was not responsible for further disability payments, although Presbyterian could not recover payments already made. The court reasoned that the contractual provision regarding disability payments unambiguously provided that Presbyterian's only obligation was to pay Langer sufficient after-tax dollars for him to purchase insurance. The court dismissed the *Monarch* action as

moot in light of that reasoning, but it left the other claims and counterclaims (including Langer's claims for wrongful discharge and intentional infliction of emotional distress and Presbyterian's counterclaim for repayment of loans) for trial. That trial resulted in a hung jury, but Langer and Presbyterian later settled those claims. As part of the district court's January 5, 1989 order approving the settlement, however, Langer's right to appeal the summary judgment in favor of Presbyterian on the disability payments claim was preserved.

Langer appealed, and on July 6, 1989, this court reversed, concluding that the employment contract was ambiguous as to who would bear the loss if insurance coverage was not obtained. *Langer v. Monarch Life Insurance Co.*, 879 F.2d 75 (3d Cir. 1989) ("*Langer I*"). In light of the reversal in the *Langer* action, this court reinstated the *Monarch* action with instructions to consider Monarch's pending motion for summary judgment. Discovery closed on December 15, 1989, and trial was scheduled for January 1990.

Trial was delayed, however, and in the interim, on March 9, 1990, the district court revisited Monarch's pending motion for Rule 11 sanctions (including attorneys' fees) regarding the "cross-claim" controversy. Although the court again criticized Presbyterian's counsel for "questionable" conduct in filing a document that "probably had no legal basis under the Federal Rules of Civil Procedure" and for not rectifying the error upon notice by opposing counsel, it declined to order sanctions. The court ruled that Monarch's attorneys' fees were not reasonable expenses because Monarch, by moving to strike instead of "awaiting the inevitable" entry of the default judgment, could have avoided its expenses. Concluding its ruling, the court admonished the parties that "the time ha[d] come to get on to the substance of this case."

On April 24, 1990, before trial, the district court granted Monarch's motion for summary judgment in the *Monarch* action, basing its ruling on various judicial admis-

sions by Presbyterian.[4] Presbyterian moved for reconsideration, but the district court held that motion in abeyance. Trial in the *Langer* action began on May 14, 1990.

The trial, like the rest of the litigation, proved fractious. Citing Langer's discovery defaults (particularly his failure to provide certain documents until trial and his failure identify an expert witness until the eve of trial), the district court felt it necessary to recess the trial for two weeks in the middle. Eventually the trial was completed, and on June 15, 1990, the jury returned a unanimous verdict for Langer and against Presbyterian. Specifically, the jury verdict found that the "letter agreement between Dr. Langer and Presbyterian obligated Presbyterian to pay disability income to Dr. Langer in the event he became disabled," and that Presbyterian was "obligated to pay disability income to Dr. Langer beyond the date the Dr. Langer returned to work full time." The jury awarded Langer the full $855,000 that he sought—$270,000 per year for the period July 1987 through July 1990, plus $3,000 per month withheld during the April 1986 to June 1987 period. Because the jury awarded Langer his full request on his primary breach of contract theory, it did not reach his alternative theories based on fraud and detrimental reliance. On June 19, 1990, judgment was entered on the verdict.

In an opinion dated October 31, 1990, the district court denied Presbyterian's post-trial motions for judgment notwithstanding the verdict or for a new trial. It also granted Langer's motion for prejudgment interest, but it denied his motion to amend the judgment or mold the verdict to declare him permanently disabled and give him the same annual benefits in the future.[5] Finally, the court reaffirmed its summary judgment against Presbyterian in the *Monarch* action by denying Presbyterian's motion for reconsideration.

These appeals followed. Presbyterian appeals from the district court's rulings in both the *Langer* and *Monarch* actions. Langer cross-appeals from the district court's refusal to award him future damages against Presbyterian.[6] Monarch cross-appeals from the district court's denial of Rule 11 sanctions against Presbyterian. The district court had diversity jurisdiction under 28 U.S.C. § 1332 (1988). We have jurisdiction over the district court's final judgments and orders under 28 U.S.C. § 1291 (1988).[7]

---

4. Langer had filed a third amended complaint in the *Langer* action on October 28, 1989, adding counts against Presbyterian alleging fraudulent inducement into an employment contract, negligent misrepresentation, detrimental reliance, and seeking reformation of the employment contract. On March 13, 1990, Presbyterian was permitted to add corresponding counterclaims in the *Monarch* action. On April 19, 1990, Monarch filed a supplementary summary judgment motion encompassing those additional claims, but Presbyterian had not had a chance to respond when the district court issued its April 24, 1990 order granting Monarch's motion for summary judgment. The district court accepted Presbyterian's later briefing on those new counts and considered (and rejected) those arguments in its post-trial opinion.

5. On March 19, 1991, Langer filed a new action in the district court, No. 91–1814, in which he seeks damages through the year 2005, based on the same claim upon which he won the jury verdict. Alternatively, he seeks a declaratory judgment that Presbyterian is bound to continue to make $270,000 in annual disability payments to him until he dies or reaches age 65. The district court has stayed this latest action pending resolution of these appeals.

6. Langer also purported to appeal from the district court's denial of his motion for a directed verdict at the close of evidence. He now concedes, however, that he made no such motion. We have accordingly stricken Parts I and II of his reply brief.

7. This case involves eleven appeals and cross-appeals, many of them duplicative because the parties, uncertain whether certain of the district court's actions were then final under 28 U.S.C. § 1291 (1988), filed protective appeals and cross-appeals. We have determined that we have appellate jurisdiction over each of the parties' claims. Even if some of the earlier appeals were premature when filed, they have now ripened. See, for example, *FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.,* —— U.S. ——, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991); *New Castle County v. Hartford Accident & Indemnity Co.,* 933 F.2d 1162, 1177–80 (3d Cir.1991); *Cape May Greene, Inc. v. Warren,* 698 F.2d 179, 184–85 (3d Cir.1983).

## II. PRESBYTERIAN'S APPEAL IN THE *LANGER* ACTION

### A. *Overview of the Issues*

In *Langer I*, both Presbyterian and Langer argued to this court that the contract was unambiguous and that they were entitled to summary judgment. Presbyterian argued that the contract unambiguously required it to do no more than provide funds for Langer to purchase his own insurance (taking taxes into account), a duty that Presbyterian had undoubtedly fulfilled. The district court had adopted this interpretation. Langer, in contrast, contended that the contract contained Presbyterian's unconditional promise to provide disability benefits, whether or not Langer was able to obtain insurance. On this view, Presbyterian was primarily liable to provide Langer with disability benefits, not just money to pay insurance premiums, although Presbyterian was permitted to fulfill its duties by buying insurance from a third party insurer which would actually disburse the benefits.

As noted above, this court held that the clause of Langer's employment contract covering disability benefits was ambiguous, and that neither party was entitled to summary judgment. In so holding, we noted that, because the contract made no statement as to who would bear the loss if no coverage were obtained, a third interpretation was possible: that Presbyterian would pay for premiums, but would also be an insurer, although only of last resort. That is, Langer may have had the duty to attempt to obtain insurance, but Presbyterian would be responsible to make disability payments if Langer was unable to obtain insurance. 879 F.2d at 81 n. 7.[8] Under this interpretation, Presbyterian was only liable in the absence of coverage by Monarch.

At trial after remand, Presbyterian accordingly sought to adduce evidence that Langer had obtained insurance from Monarch.[9] The district court, however, ruled that the question of primary versus secondary liability (including whether Langer had insurance with Monarch) was a question of law for the court, and should not be argued to the jury. At the close of evidence, Presbyterian moved for a directed verdict that it had performed its obligation, at least to the extent of the $204,000 in annual coverage that Langer allegedly had with Monarch.[10] That motion was denied, as was Presbyterian's post-trial motion for judgment notwithstanding the (adverse) verdict.

Presbyterian now reiterates its argument that the district court should have decided as a matter of law that Langer did have interim insurance with Monarch, and that, as a result, its liability must be reduced by $204,000 per year.[11] In the alternative, Presbyterian suggests that the question whether insurance existed depended on disputed factual issues which should have been submitted to the jury, and that the district court erred by refusing to give Presbyterian's proposed jury instruction on that question.

---

**8.** In a variation on this theory, Presbyterian would have the duty to seek insurance on Langer's behalf. It does not matter, however, whether Presbyterian or Langer had a duty to *seek* insurance, because neither party breached that duty. Presbyterian does claim that, by settling with Monarch years later, Langer breached his duty to cooperate in good faith to obtain insurance, but we reject that argument at 799. Accordingly, for present purposes this fourth interpretation merges with the third.

**9.** Of course, Langer's alleged insurance with Monarch would have been irrelevant under Presbyterian's preferred interpretation (duty only to provide money for premiums), but Presbyterian did not want to press that theory alone. If Langer's preferred interpretation of the contract (unqualified duty to provide benefits) were

adopted, even though Presbyterian would be directly liable to Langer, Presbyterian contends that, as a result of Langer's insurance policy with Monarch, it has a liability-over claim against Monarch. See Part III.

**10.** Even assuming the existence of insurance with Monarch, it still does not appear that, under this third theory, Presbyterian could escape liability for the difference between the approximately $270,000 in coverage that Langer was promised and the $204,000 in coverage that he actually had.

**11.** Presbyterian was fully able to argue to the jury its preferred theory—that it had only the obligation to provide only money to purchase insurance—but the jury rejected it.

Our review of the district court's legal decision to withhold this issue is plenary. The parties agree that Pennsylvania substantive law governs in this diversity case.

### B. *Langer's Alleged Interim Insurance With Monarch*

#### 1. The Collister Issue (Introduction)

Presbyterian contends that Langer had an interim insurance contract with Monarch under the principles of *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978). In *Collister*, the plaintiff's husband had applied for life insurance from the defendant insurance company, and the insurance company had accepted a two-month premium as a "conditional receipt." At the time that the plaintiff's husband died, the insurance company had neither issued the policy nor rejected the application. The insurance company subsequently denied liability, asserting that the applicant had failed to take a medical examination as required.

The Pennsylvania Supreme Court in *Collister* held that the insurance company's acceptance of the application form and the first premium payment created a temporary insurance contract extending from the acceptance of the deposit until the insurance company either accepted or rejected the application. 388 A.2d at 1348. The court based its decision on the reasonable expectations of the insured, holding that

> [i]n situations where the circumstances of the transaction do not indicate that the insurer intended to provide interim insurance, but nevertheless show that the insurer accepted payment of the first premium at the time it took the application, it is then up to the insurer to establish by clear and convincing evidence that the consumer had no reasonable basis for believing that he or she was purchasing immediate insurance coverage.

Id. at 1353.

The court concluded that an insurance company could meet its burden by inform-

ing the prospective applicant, in a manner calculated to attract the applicant's attention and before money changes hands, that no immediate coverage would be provided. Id. at 1355. Nevertheless,

> [o]nly after such an unequivocal showing that the consumer is to be given no immediate benefits in return for his or her cash payment can a court say that the insurer has sustained its burden of establishing by clear and convincing evidence that the consumer could not reasonably have expected to receive immediate coverage in return for the payment of the required premium.

Id.

In this case, the district court refused to charge on *Collister* and, after trial, ruled that *Collister* did not apply. Therefore, in the district court's view, Langer had no insurance coverage with Monarch, and the third (backup insurer) interpretation of the contract could not help Presbyterian, even if correct. We could uphold the district court's ruling on either of two grounds. First, we could rule, as did the district court, that Presbyterian had no standing to raise the *Collister* issue when Langer, the putative insured, no longer wishes to.[12] Second, even if *Collister* applies, if no reasonable jury could have found that Langer had a reasonable expectation of interim coverage, then the district court's holding was correct, although this was not its stated rationale.

#### 2. Presbyterian's Standing to Raise Langer's Rights Under Collister

■ We first turn to Presbyterian's standing to raise this defense. Unfortunately, *Collister* and its progeny do not make clear whether only insureds and their successors have standing to assert *Collister* claims, so we must predict the position of the Pennsylvania Supreme Court. Pres-

---

12. At one point in its opinion denying Presbyterian's post-trial motions, the district court suggested that our opinion in *Langer I* "was clearly predicated on the absence of insurance coverage in this case." The cited portion of that opinion, 879 F.2d at 81 n. 7, contains no such intimation, and the issue of Langer's insurance with Monarch was not properly before this court at that time, nor was it argued. The law of the case doctrine thus does not apply to our decision on this issue.

byterian asserts that it has standing because it has a legal interest in proving that Langer had insurance. Presbyterian clearly meets that minimum requirement for standing,[13] for there was certainly sufficient evidence for the jury to adopt the third interpretation. For example, one can read the testimony of Langer and his attorney, Weiss, to say that they expected that Presbyterian would be the insurer of last resort. If the jury did adopt that interpretation, Langer's lack of coverage with Monarch would have been, in effect, a condition precedent to Presbyterian's liability to pay disability benefits.[14]

But Presbyterian's argument is too facile, because it fails to confront the question whether the purposes of *Collister* would be served by extending it to third party claimants, and if so, which ones. Pennsylvania courts must inquire whether a party's claim is within the "zone of interests" of a statute. See *Upper Bucks County Vocational–Technical School Education Association v. Upper Bucks County Vocational Technical School Joint Committee*, 504 Pa. 418, 423, 474 A.2d 1120, 1122–23 (1984). Similarly, we should inquire if Presbyterian's claim is within the zone of interests protected by *Collister*, which is as binding as a statute. Moreover, we must decide whether Presbyterian has the right to raise Langer's *Collister* claim against Langer himself, which is an issue of third party standing. We consider these two issues in turn.

■ The district court concluded, albeit without citation or further discussion, that "*Collister* does not apply ... where a third party attempts to take advantage of a presumption of insurance coverage available from a collateral source." That view has

some support in *Collister:* the Pennsylvania Supreme Court's primary concern was to protect the reasonable expectations *of the consumer applicant.* 388 A.2d at 1353–54. On the other hand, the case also emphasized that insurance companies were gaining the use of a premium without giving comparable benefits:

> Courts must also keep in mind the obvious advantages gained by the insurer when the premium is paid at the time of application. An insurer should not be permitted to enjoy such benefits without giving comparable benefit in return to the insured.

*Id.* at 1354. We think it follows that the payor of those premiums normally has standing to raise the insured's *Collister* claim, as long as that payor has suffered injury as a result of the denial of coverage. Usually, of course, the payor *is* the applicant, but in this case, Presbyterian paid Langer's initial premium, and hence had interests with which the Pennsylvania Supreme Court was concerned in *Collister.*

We reach this conclusion even though here Presbyterian asserts the existence of Langer's insurance coverage under *Collister* against Langer himself. Ordinarily courts decline to accord third-party standing because the right-holder normally has no obstacles to suing and will likely be the better proponent of its views. See, for example, *Amato v. Wilentz*, 952 F.2d 742 (3d Cir.1991); *1000 Grandview Association v. Mt. Washington Associates*, 290 Pa.Super. 365, 434 A.2d 796 (1981); *Harrisburg School District v. Harrisburg Education Association*, 32 Pa.Comm. 348, 379 A.2d 893 (1977). The case against finding standing would seem especially strong when, as here, the third-party claimant asserts the

---

13. Standing issues usually present themselves where the standing of a plaintiff to raise a claim is in question, but similar principles govern a defendant's capacity to raise a defense. Pennsylvania law requires that a party, at a minimum, "(a) have a substantial interest in the subject-matter of the litigation; (b) the interest must be direct; and (c) the interest must be immediate and not a remote consequence." *South Whitehall Township Police Service v. South Whitehall Township*, 521 Pa. 82, 555 A.2d 793, 795 (1989) (quoting *Franklin Township v.*

*Department of Environmental Resources*, 500 Pa. 1, 4, 452 A.2d 718, 719 (1982)).

14. As we discuss in Part III, both Langer and Monarch suggest that Presbyterian has judicially admitted that it had no legal interest in Langer's application with Monarch. We conclude there that Presbyterian admitted only that it would have no right to receive disability payments as a beneficiary of Langer's policy with Monarch, which is quite a different matter.

right-holder's right against that same right-holder.

But this is a special case. Here, Langer himself raised the *Collister* question in his complaint. He subsequently obtained a very valuable settlement, approved by the district court, on the basis of that claim. We need not decide whether Langer is now estopped from denying the existence of insurance coverage with Monarch altogether, for that broader question was not properly raised before us. We do conclude, however, that application of the usual prudential rule against third-party standing is inappropriate here. Langer raised his rights under *Collister*—an issue that affects all the parties—before the court, and thereby forfeited any objection to the litigation of that question by these parties in this case.

### 3. Langer's Reasonable Expectations

■ Turning to the merits of the *Collister* claim, the undisputed evidence shows that Monarch accepted Langer's application for disability insurance, that Monarch accepted the initial premium for such insurance, and that Langer believed that he was covered by Monarch. Presbyterian suggests that this is enough to establish, as a matter of law, that Langer did have insurance with Monarch. But the *Collister* claim depends on the *reasonable* expectations of the insured. Correspondingly, Langer's subjective expectations do not control; rather we must consider what a reasonable person in Langer's shoes would have expected.

Langer, of course, is a physician (and therefore arguably more likely to know of problems of medical insurability than the average person). Moreover, he knew his own medical history, including his heart

attack two years earlier. On the other hand, Langer had passed his medical examination with flying colors, which he knew, and he knew that Monarch had accepted Presbyterian's initial premium payment (made on his behalf).

Moreover, one might impute to Langer the knowledge of Presbyterian's Hardin, who was arguably acting as Langer's agent in obtaining coverage. Agins, the insurance broker, had told Hardin that two companies would not even consider disability insurance for Langer, and that if a company did write a policy for someone with Langer's medical history, it would be for a limited amount of money and conditioned on a physical examination. Hardin, however, apparently believed that the premium deposit that Monarch accepted was a binder that covered Langer during the interim before a final decision was made. Again, however, that was a subjective belief.

■ At all events, under *Collister*, the burden is on the insurer to prove by *clear and convincing* evidence that the insured had no reasonable expectation of coverage. Given this legal standard and the foregoing factual matrix, we believe that this close question, which might involve witness credibility determinations, was for the jury. We cannot say as a matter of law that Langer did or did not have a reasonable belief that he was insured. See *Blair v. Manhattan Life Ins. Co.*, 692 F.2d 296 (3d Cir.1982) (question of physician's reasonable basis for believing that he was purchasing interim insurance coverage was properly for the jury; jury verdict for defendant insurance company upheld). The district court therefore erred in keeping the *Collister* question from the jury.[15]

---

**15.** It does not follow, however, that the district court erred in excluding from evidence. Defendant's Exhibit 55. That exhibit was a copy of a check and stub from Monarch to Langer reflecting payment pursuant to a numbered policy with a disability date. Presbyterian asserts that this was evidence that Langer indeed had insurance with Monarch. Monarch asserts that this payment was pursuant to Langer's settlement with Monarch and that the policy number was a "ghost number" for accounting purposes. To our knowledge, Presbyterian has not challenged Monarch's assertion, although we do not agree

with Langer that Presbyterian has waived its objection to the exclusion of this exhibit.

The district court ruled that Defendant's Exhibit 55 should be excluded, along with all other evidence of the Langer–Monarch settlement, because such evidence would confuse and perhaps prejudice the jury by encouraging it to evaluate the settlement and take its eye off the contractual issues between Langer and Presbyterian. The court also took note of the policies behind Federal Rule of Evidence 408, which provides that

In sum, the jury could have adopted the third interpretation of the contract and could have concluded that Presbyterian was only liable as an insurer of last resort. Preventing the jury from considering that question was reversible error because the jury could have concluded that Langer had $204,000 in annual disability insurance with Monarch, and therefore that Presbyterian's potential liability as a backup insurer was only approximately $66,000 per year (the difference between the approximately $270,000 promised in total and the $204,000 in insurance with Monarch). Accordingly, we must vacate the judgment for Langer and remand for a new trial.

## C. *Other Issues*

Presbyterian alleges a host of additional errors by the district court. Some of those arguments are moot in light of our decision to remand for a new trial. Others are meritless or are better left to the district court to decide on remand. Still others are essential to resolve for the guidance of the district court on remand. We will briefly consider each of them.

1. Effect of Langer's Release of Monarch on Presbyterian's Subrogation Rights

■ Presbyterian argues that Langer's release of Monarch destroyed Presbyterian's subrogation rights against Monarch, and thereby released Presbyterian. That theory depends in part on the characterization of Presbyterian as a backup insurer or guarantor, which we cannot decide as a matter of law. We therefore do not reach this issue.

2. Langer's Settlement as a Breach of His Duty to Cooperate in Good Faith to Obtain Insurance

■ Presbyterian argues that, by settling with Monarch, Langer breached his duty to cooperate in good faith to obtain insurance, again under the backup insurer interpretation of the contract. We reach this issue because even if we assume that the jury would find that Langer had such a duty, we think it plain that he fulfilled his duty. Surely Langer attempted in good faith to secure insurance before he settled: he underwent his physical examination and even brought suit against Monarch. Nor did he breach any duty by settling. Even if we assume that Langer's duty to Presbyterian to attempt to secure insurance continued after Presbyterian terminated the contract, we do not believe that a reasonable jury could conclude that it was bad faith to settle an uncertain claim against Monarch at a time when Langer was not receiving disability benefits from either defendant.

3. Langer's Settlement as a Failure to Mitigate Damages

■ Presbyterian argues that the district court erred in taking from the jury the issue of Langer's failure to mitigate damages. Presbyterian now concedes that the district court charged the jury on Langer's duty to mitigate damages. Instead, it premises its argument on the district court's exclusion of evidence of the Langer–Monarch settlement agreement, which, says Presbyterian, shows that Langer committed himself to maximizing his damages against Presbyterian. Because this issue is likely to resurface on remand, we will reach it. The district court heard lengthy argument on whether to admit evidence of the settlement. It eventually concluded, under Federal Rule of Evidence 403, that this evidence would have confused the jury and misplaced their focus onto the minor subsidiary issue whether the settlement was a good deal rather on than the major issues in the case. The district court may,

---

evidence of settlements is not admissible to prove or disprove liability.

Because of our decision to remand the *Collister* issue for trial, we need not review the district court's conclusion on Exhibit 55. The issue of the check and stub will no doubt arise again, however. We therefore observe that whether Langer had insurance with Monarch depends on Langer's reasonable expectations, to which Defendant's Exhibit 55 would seem irrelevant. Even under Presbyterian's view, the check and stub evidence payment under an insurance contract, and the only way that such a contract could have come into existence is under the principles of *Collister*.

of course, revisit this issue on remand, but we cannot say that the court abused its discretion in excluding this evidence at the last trial.

### 4. The District Court's Failure to Mold the Jury Verdict to Set Off Langer's Settlement Payments from Monarch

Presbyterian submits that the district court erred in refusing to mold Langer's jury verdict by reducing it by the amount of the "loan" payments that Monarch has made to Langer pursuant to their settlement. Because Langer's verdict has been set aside, Presbyterian's request for molding is moot.[16]

### 5. Failure to Cure Langer's Eve-of-Trial Discovery Defaults

Presbyterian contends that Langer's delay in producing documents important to damages questions until the first day of trial and his late identification of his expert witness on damages, Bruce Dominick, deprived it of a fair trial. The district court agreed that Langer's conduct was inexcusable and granted a mid-trial recess, but Presbyterian argues that the recess was an insufficient cure. Because damages issues will be retried along with the rest of the case, we need not decide the moot question of prejudice from Langer's default.

### 6. Admission of Dominick's Testimony Based on Internal Guidelines at UNUM

■ At trial, the parties disputed the valuation of Langer's damages. Langer argued that his benefits should be measured as $270,000 per year no matter what the extent of Langer's disability. Presbyterian contended that Langer was entitled only to double the benefits that he would have had at HUP, and that the clinical

practice policy that had covered him there would have given him only partial payment in case of partial disability.[17] Langer therefore called Dominick, an employee of UNUM, the carrier that issued the HUP clinical practice policy, to testify as to the amount of benefits to which Langer would have been entitled at HUP.

Over objection, Dominick testified, based in part on internal guidelines at UNUM, that Langer would have been entitled to receive the maximum disability benefit rather than a partial benefit. Presbyterian now asserts that the district court erred in allowing Dominick to testify based on the administrative policies of UNUM. Presbyterian objects that the UNUM guidelines controverted the plain language of the UNUM policy and therefore were not incorporated into the Presbyterian–Langer contract. Because the same issue will probably arise on retrial, we will comment briefly.

We agree with Presbyterian that the Langer–Presbyterian contract is unclear on the valuation question, but the very valuation that Presbyterian proposed was double Langer's previous coverage. To determine Langer's previous coverage, the district court properly admitted testimony on what that coverage would have been—even if Langer and Presbyterian did not know of each of the specific provisions. Presbyterian argues (and Langer does not seem to contest) that under the clinical practice policy, Langer would have been entitled to the maximum benefit only if his earnings loss exceeded eighty percent of pre-disability earnings, and the benefit would have been pro-rated for losses of twenty to eighty percent.

Based on the tax returns of Langer's professional corporation, Presbyterian contends that Langer's loss in overall earnings

---

16. Our decision to reverse and remand for a new trial also moots Langer's cross-appeal seeking molding of the jury verdict to cover future damages. As we mentioned in note 5, Langer has another action pending in the district court claiming damages for the period after the verdict in this case. We leave it to the district court to decide whether and how to consolidate that action with the remand of this action.

17. Langer's clinical practice policy at HUP provided him with up to $120,000 in annual benefits. Langer also had another policy at HUP that provided him with $15,000 in annual coverage.

after his stroke was far less than eighty percent. But, as far as we can tell from the limited record on appeal, Dominick's testimony was based on a narrower definition of income—income that Langer himself derived from his clinical practice, rather than all income earned by the professional corporation. Presbyterian offers no citation to the record for how that definition, based on UNUM's internal guidelines, controverted the unambiguous terms of the clinical practice policy or the booklet describing the policy. We therefore find no error in the admission of Dominick's testimony.

### 7. Admission of Unauthenticated Tax Returns

Finally, Presbyterian argues that the district court should not have admitted documents alleged to be Langer's tax returns, and therefore Langer had failed to prove his damages. Because this was a matter of the formalities of authenticating evidence, we doubt that the issue will arise on retrial, and therefore will not reach it.

## III. PRESBYTERIAN'S APPEAL IN THE *MONARCH* ACTION

### A. *Overview of the Issues*

Monarch's complaint in the *Monarch* action sought a declaratory judgment that Presbyterian had no valid claims for recovery against Monarch. Our analysis must therefore center on Presbyterian's four counterclaims that Monarch is liable to Presbyterian.

Count I alleges that Monarch is liable over to Presbyterian under the equitable principles of indemnity and subrogation, as well as promissory estoppel (detrimental reliance). Count II alleges that Presbyterian is a third-party beneficiary of Langer's temporary insurance contract with Monarch, and that Monarch is contractually liable to Presbyterian for failure to pay Langer any disability benefits. Count III alleges that if Presbyterian is liable to Langer on either fraud or detrimental reliance theories, then Monarch is liable over to Presbyterian on the same theory or theories. Finally, Count IV asserted that Monarch, by settling with Langer, tortiously interfered with Presbyterian's employment contract with Langer. All of Presbyterian's counterclaims are contingent on Presbyterian's liability to Langer in the *Langer* action.[18]

Before trial in the *Langer* action, and based on Presbyterian's responses to Monarch's requests for admissions under Federal Rule of Civil Procedure 36, the district court granted summary judgment to Monarch on the first two counts (indemnity, subrogation, detrimental reliance, and promissory estoppel). The district court's stated rationale for granting summary judgment to Monarch was extremely brief, consisting only of a footnote to its order.[19] After trial, the district court ruled that Count III (liability over based on fraud or detrimental reliance) had no legal basis because the jury had awarded Langer benefits only on a breach of contract theory. Finally, the district court dismissed Count IV on the ground that the Langer–Monarch settlement could not have tortiously interfered with the Langer–Presbyterian employment contract because Presbyterian repudiated that contract in June 1987, months before Langer's settlement with Monarch. Our review of the district court's grant of summary judgment is plenary.

Presbyterian appeals from the district court's judgment as to all counts, but our discussion will concentrate on the judicial admissions issue which affects the first

---

**18.** Counts I and II were part of Presbyterian's original answer. Counts III and IV were added in response to Langer's addition of fraud and detrimental reliance claims in his third amended complaint.

**19.** The footnote read:
See e.g. Presbyterian's Admissions Nos. 20, 31, 32, 33; Fed.R.Civ.P. 36; *Airco Indus. Gases v.*

*Teamsters Welfare Pension Fund,* 850 F.2d 1028 (3d Cir.1988) (An admission under Rule 36 is an "unassailable statement of fact that narrows the trial issues in the case"); *See also Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976) (upholding a district court's grant of summary judgment based in part on a Rule 36 admission).

two counts. The district court's ruling on Count III was based solely on the jury verdict. Presbyterian's appeal as to that count is dependent on our reversing Langer's judgment in the *Langer* action and ordering a new trial wherein Langer could reassert his noncontractual claim of detrimental reliance. We have done so, and therefore need not discuss Count III further. We will affirm the district court's judgment on Count IV because we find its logic unassailable. Because Presbyterian itself declared its contract with Langer "null and void" well before Monarch settled with Langer, Monarch, by settling, could hardly have interfered with the contract between Langer and Presbyterian or with prospective economic relations between them.

The primary question before us is thus whether Presbyterian, by its responses to Monarch's requests for admission under Rule 36, judicially admitted facts that destroy the legal predicate for its counterclaims. According to Monarch, Presbyterian has admitted that it never had a relationship with Monarch that could be the basis for any claim against it. Monarch asserts that for Presbyterian to establish any liability-over claim against Monarch, two conditions must exist. First, Presbyterian must have had a duty to pay disability benefits to Langer (something that Presbyterian has continuously denied in the *Langer* action). Second, Presbyterian must have had a legally recognizable interest in the alleged Langer–Monarch insurance contract.[20]

As to the former, Monarch contends that Presbyterian's admissions bound it to its position in the *Langer* action and prevent it from arguing alternatively in the *Monarch* action. As to the latter, according to Monarch, Presbyterian has admitted that Langer's application with Monarch was separate and independent from his employment agreement with Presbyterian, and that Langer had exclusive rights in whatever coverage he might obtain. We will examine these issues separately. Before we do so, however, we must grapple with Presbyterian's contention that its admissions cannot count because the ordinary rules of judicial admissions do not apply where a party has pled a contingent liability-over claim.

### B. The Interaction of Rules 8(e)(2) and 36

■ Rule 8(e)(2) specifically countenances pleading in the alternative: "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses.... A party may also state as many separate claims or defenses as the party has regardless of consistency...."[21] Presbyterian is certainly correct that it is entitled, under the Federal Rules, to pursue third-party liability-over claims while contesting the underlying claim. This is so even though the *Langer* and *Monarch* actions are separate suits that have been consolidated, so that Rule 8(e)(2) does not even technically come into play.

---

**20.** Actually, contrary to Monarch's view, Presbyterian's claim in Count I that it detrimentally relied on statements by Monarch might *not* depend on the existence of the Langer–Monarch contract. As we understand this claim, Presbyterian seeks recovery not based on a Langer–Monarch contract, but on *representations* by Monarch's alleged agent Agins *to Presbyterian* that, as a result of the alleged binder, Langer was temporarily covered. Presbyterian claims that it detrimentally relied on that promise by not investigating other sources of insurance coverage, by not asking Langer to delay his transfer until insurance was obtained, and by relaying Monarch's supposed assurance to Langer (which might lead to Presbyterian's own liability to Langer on a related theory of detrimental

reliance). Therefore, even if Monarch were correct that Presbyterian admitted that it had no legal interest in the Langer–Monarch contract, those admissions would not necessarily have disposed of the detrimental reliance claim in Count I.

**21.** Generally, an alternative claim is of the form "either-or," while a hypothetical claim is of the form "if-then." See Charles Alan Wright & Arthur R. Miller, 5 *Federal Practice and Procedure* § 1282 at 525 (West, 2d ed. 1990). Presbyterian's liability-over claims in the *Monarch* action are hypothetical claims depending on its loss in the *Langer* action, rather than alternative claims.

Presbyterian goes further, however, and argues that any Rule 36 judicial admissions it may make in the *Monarch* action do not ripen until it has been found liable in the *Langer* action, and thus cannot support summary judgment in the *Monarch* action. Moreover, it argues that if it has admitted facts consistent with its theory in the *Langer* action (such as that it had no duty to pay benefits to Langer), but the jury in the *Langer* action has rejected those facts, then the admissions have been superseded, and should not be used to estop it in the *Monarch* action.

Because Presbyterian's position is fundamentally inconsistent with the rules regarding judicial admissions, we decline to endorse it. Under Rule 36(a),

> [a] party may serve upon any other party a written request for the admission, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to fact....

Rule 36(b) describes the effect of an admission:

> Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.... Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding.

As the advisory committee notes to the 1970 amendments observed,

> Rule 36 serves two vital purposes, both of which are designed to reduce trial time. Admissions are sought, first to facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that can be.

Accordingly, we have held that an admission of facts made under Rule 36 is an "unassailable statement of fact that narrows the triable issues in the case." *Airco*

*Industrial Gases, Inc. v. Teamsters Health & Welfare Pension Fund,* 850 F.2d 1028, 1037 (3d Cir.1988). We have also held that Rule 36 admissions are conclusive for purposes of the litigation and are sufficient to support summary judgment. *Anchorage Associates v. Virgin Islands Board of Tax Review,* 922 F.2d 168, 176 n. 7 (3d Cir.1990).

We see no reason why rigorous application of Rule 36 undermines the privilege to plead in the alternative. A party may certainly allege inconsistent facts in its pleadings, but requests for admission typically come late in discovery, or even after discovery has been completed and trial is imminent. If at that point a party is served with a request for admission of a fact that it now knows to be true, it must admit that fact, even if that admission will gut its case and subject it to summary judgment. That is what Rule 36 was intended to do—narrow the issues for trial, or even altogether obviate the need for trial.

We also see no reason why application of Rule 36 would thwart the privilege to plead hypothetically. Presbyterian objects that allowing Rule 36 to apply in full force would allow every third-party defendant to force a defendant with a liability-over claim to admit defeat against either the plaintiff or the third-party defendant. We disagree. In this case, suppose (contrary to fact, as we shall explain), that Monarch had asked Presbyterian to admit that the hospital "is not liable" to Langer on any theory. A proper answer to that request would be to object that the statement could not be admitted or denied, because the fact of actual liability would still be undetermined (because not yet litigated to judgment); Presbyterian could admit only that it believed and had taken the legal position that it was not liable to Langer (a legal position that it might win or lose at trial). Summary judgment on the liability-over claim would not follow on the basis of this non-admission, which is why third-party defendants do not bother making such pointless requests for admission.[22]

---

22. Conceivably, a third-party defendant could nonetheless attempt to trip up an unwary defendant/cross-claimant by getting the defendant to admit that it "is not liable" to the plaintiff.

On the other hand, if Presbyterian were asked to admit a specific operative fact about a past event (such as the intent of one of its officers at a particular juncture), it must admit that fact if the fact is known to be true. And that admission could be used to support summary judgment against it, even on a hypothetical, liability-over claim. Third-party defendants do not have to wait for the plaintiff to succeed against the original defendant before filing motions for summary judgment.

In sum, Presbyterian's suggested conflict between the doctrine of judicial admissions and the privilege to assert liability-over claims appears illusory.[23] The purposes of Rule 36 would seem fully served by applying the Rule in this case. Presbyterian's admissions, such as they were, were binding, and we therefore proceed to decide just what Presbyterian did admit.

### C. *Presbyterian's Admissions*[24]

#### 1. Did Presbyterian Commit Itself to Relying on Only One Theory?

■ We begin with Presbyterian's Responses to Monarch's Requests for Admissions Nos. 20, 23, 27, 28, and 29. Monarch asserts that these responses collectively admitted that Presbyterian had no contractual obligation to guarantee any disability payments to Langer, but only to provide Langer with sufficient after-tax dollars for him to buy insurance. It would be surprising if Presbyterian's responses *rejected* that interpretation of the contract, for that has been Presbyterian's primary theory of the case all along, one it stands by today even after losing a jury verdict. The real question is whether these admissions show that Presbyterian elected to rely *exclusively* on that theory, thereby foreclosing re-

liance on the backup insurer interpretation of the contract.

Monarch's Request for Admission No. 20 read: "After further negotiations the Medical Center offered Dr. Langer, *inter alia*, double the disability income benefits which he was receiving at HUP." Presbyterian's response was:

Admitted in part, denied in part. Admitted that, after a period of negotiation, Presbyterian offered to make payments to Langer which would provide him with sufficient after-tax dollars to purchase disability income insurance coverage in an amount that was double the amount Presbyterian believed Langer was receiving from HUP. *Denied that Presbyterian ever agreed that it would insure Langer against disability in the event that Langer failed to obtain coverage from a disability income insurer.*

(emphasis added).

Monarch's Request for Admission No. 23 read: "The Medical Center agreed to provide the guarantee requested by Dr. Langer." Presbyterian responded:

Admitted in part, denied in part. Admitted only that, as a result of negotiations with Langer, Presbyterian agreed to include in its written contract of employment with Langer the following language: "We guarantee the benefits stated above for a ten (10) year period. This guarantee is subject to Dr. Langer maintaining his full-time clinical practice at Presbyterian–University of Pennsylvania Medical Center." It is *denied that this language has or was intended to have the effect of supplementing or altering any of the benefits provisions contained in the contract or any limitations thereon. It is further denied that*

---

Even if so, however, upon the third-party defendant's motion for summary judgment on the basis of the admission, the defendant could move to withdraw or amend the admission under Rule 36(b). Surely, if the defendant was simply duped, the court would grant leave to withdraw or amend.

**23.** Because Presbyterian's argument appears unprecedented, we do not rule out the possibility that the conflict may be real in an unusual case.

**24.** The district court's order cited Presbyterian's responses to Monarch's Requests for Admission Nos. 20, 31, 32, and 33. We will also examine the responses to requests 23, 25, 26, 27, 28, and 29, upon which Monarch relies in its brief and upon which the district court may also have relied (its citation signal was *"See e.g.,"* see note 19). Rather than go through the admissions in numerical order, we will divide them into two groups according to Monarch's two major arguments.

*Presbyterian agreed to guarantee that Langer would receive disability income, as distinct from compensation with which Langer could purchase disability income insurance.*

(emphasis added).

Monarch's Request for Admission No. 27 read: "At the time the Medical Center extended its ultimate offer of employment to Dr. Langer, it did not intend to be the owner of any disability insurance policy that might thereafter be obtained by or on behalf of Dr. Langer." Presbyterian responded:

Presbyterian objects to this request on the ground that, by reason of its use of the word "owner," a word susceptible of several interpretations, Presbyterian cannot reasonably be required to admit or deny the request. Without waiving this objection, this request is denied as stated. *At the time stated, Presbyterian contemplated that it would be responsible for the cost of premiums of a disability insurance policy to be applied for and obtained by Langer.*

(emphasis added).

Monarch's Requests for Admission No. 28 and 29 were identical to No. 27, except that they, respectively, substituted the words "beneficiary" and "purchaser" for the word "owner" in No. 27. Presbyterian's responses to Nos. 28 and 29 were essentially identical to its response to No. 27, including the objection on the ground of ambiguity and the statement that "Presbyterian contemplated that it would be responsible for the cost of premiums" for insurance obtained by Langer.

In our view, these responses were merely reassertions of Presbyterian's primary theory of the case—that Presbyterian agreed only to provide Langer with the cost of insurance premiums. Nothing in these admissions suggests that Presbyterian elected to abjure reliance on the backup insurer theory. In response to Request for Admis-

sion No. 20, for example, Presbyterian simply restated that it agreed only to make payments to Langer to provide him with sufficient after-tax dollars for him to buy insurance—something that it has argued since the beginning of this litigation. In that answer, Presbyterian did *deny* that it agreed to insure Langer if Langer failed to obtain coverage from an insurance company. But in general, a denial of a Rule 36 request for admission simply leaves the denied proposition in dispute for trial. Presbyterian's response to Request No. 20 left open for trial the issue whether Presbyterian legally bound itself to insure Langer.

Response No. 23 was similarly a reassertion of Presbyterian's primary theory of the case. Its relevant portion is also in the form of a denial, and thus it merely left as a disputed proposition for trial that "Presbyterian agreed to guarantee that Langer would receive disability income, as distinct from compensation with which Langer could purchase disability income insurance." In our view, if the jury disagreed with Presbyterian, nothing in this response prevented Presbyterian from falling back on its alternative theory that it was only a backup insurer.

Finally, in responses to Requests for Admissions Nos. 27 through 29, Presbyterian again merely restated its primary theory, and in no way bound itself to rely exclusively on that theory. These responses were denials of the requests as stated. Perhaps, however, Presbyterian's affirmative statements as to its "contemplations" could be read as admissions of the facts of what it intended at the time—namely that it would be responsible only to pay Langer's insurance premiums.[25] Rule 36 would cover an admission by Presbyterian as to what its obligations were as a matter of law, because the text of the rule specifically authorizes requests for admissions of propositions of law as applied to fact. The

---

25. Actually, Presbyterian objected to all these requests on the ground that they contained ambiguous words. The district court never ruled on those objections directly, nor did it implicitly deny the objections by stating its reliance on them in its grant of summary judgment to Mon-

arch. Technically, we could remand and have the district court review the objections, but that course is unnecessary because we conclude that even if Presbyterian had not objected, its responses do not support the grant of summary judgment against it.

problem here is that Presbyterian only admitted the fact of its intentions and not what its obligations were as a matter of law.

Monarch's argument ignores a basic tenet of contract law. Presbyterian's subjective beliefs in entering into its contract with Langer did not necessarily determine the legal meaning of that contract. If Presbyterian and Langer had shared the same subjective interpretation of the contractual provisions and had a "meeting of the minds," then their joint subjective interpretation would govern. But if, as might be the case here, Presbyterian thought it agreed to different terms than Langer did, Presbyterian's subjective interpretation would not necessarily control. Instead, Langer, as the promisee, may enforce his objectively reasonable interpretation of Presbyterian's promise, different though that may be from what Presbyterian thought it was promising. See, for example, *Ingrassia Construction Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 482–83 (1984) (outward, objective manifestations of assent govern, rather than undisclosed, subjective intentions; subjective intent forms basis of contract only if other party knows or should have known of it). See generally 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.9 (Little, Brown, 1990) (objective meaning controls, unless shared subjective intent proven); 3 Arthur Linton Corbin, *Corbin on Contracts* § 538 (West, 1963) (similar).

Therefore, at most, Admissions Nos. 27 through 29 bound Presbyterian to a position on the factual matter of its intent in August 1985 not to guarantee Langer anything more than insurance premiums (a position from which it has never retreated). Those responses do not, however, establish that Presbyterian has prevented itself from making legal arguments premised on the jury's adoption of Langer's interpretation that Presbyterian bound itself to provide disability benefits (as opposed to mere insurance premiums). Therefore, the district court erred to the extent that it awarded Monarch summary judgment on the basis of Presbyterian's responses to Requests for Admissions Nos. 20, 23, and 27 through 29.

### 2. Did Presbyterian Admit that It Had No Interest in Langer's Supposed Insurance Policy with Monarch?

■ Monarch also suggests, however, that Presbyterian's admissions prevent it from arguing that it had any rights against Monarch deriving from Langer's application to Monarch. That, says Monarch, is a second predicate to Presbyterian's liability-over claims. Monarch contends that Presbyterian has admitted that it had no obligation to obtain insurance for Langer, and hence that Langer's application to Monarch was separate and independent from his employment contract with the hospital. Monarch also argues that Presbyterian has admitted that Langer would have exclusive rights in whatever coverage he could obtain. To determine whether that is so and to assess the legal effect of such admissions, we examine Monarch's Requests for Admissions Nos. 26, 31, 32, and 33, and Presbyterian's responses thereto.

Monarch's Request for Admission No. 26 read:

> At the time the Medical Center extended its ultimate offer of employment to Dr. Langer, it intended that Dr. Langer would be responsible for applying for and obtaining all life and disability insurance coverages contemplated in its offer.

Presbyterian admitted this statement with no qualification.

Monarch's Request for Admission No. 31 read:

> When Dr. Langer had accepted the offer, the Medical Center believed that Dr. Langer was exclusively responsible for applying for and obtaining all life and disability insurances contemplated in the contract.

Presbyterian also admitted this without qualification.

Monarch's Request for Admission No. 32 read:

> At the time, the Medical Center intended that Dr. Langer would be the exclusive

owner of any disability insurance policy that he might thereafter obtain.

Presbyterian responded:

> Presbyterian objects to this request on the ground that, by reason of its use of the word "owner," a word susceptible of several interpretations, Presbyterian cannot reasonably be required to admit or deny the request. Without waiving of this objection, this request is denied as stated. *Admitted only that Presbyterian intended that Langer would have the exclusive right to receive disability income payments under the policy.*

(emphasis added).

Monarch's Request for Admission No. 33 was identical to No. 32, except that it substituted "exclusive beneficiary" for "owner." Presbyterian's response was also the same as in No. 32, except for that word substitution. It only admitted that it "intended that Langer would have the exclusive right to receive disability payments under the policy." [26]

Essentially, in its responses to this set of requests for admission, Presbyterian has conclusively admitted two facts: it intended that Langer would have the duty to obtain insurance, and it intended that Langer would have the exclusive right to receive disability payments under the policy. As to the first, Presbyterian's intention that Langer *seek* insurance is beside the point. Even if Langer agreed and this were thus tantamount to an admission that Langer in fact had the duty to seek insurance, it would not prove that Presbyterian had no cognizable legal interest in the insurance if insurance was obtained, or that the employment and insurance contractual relationships were entirely independent.

More relevant are the responses to Requests Nos. 32 and 33, wherein Presbyterian admits that, at the time Langer accepted its offer, it intended to have no right to receive disability insurance payments from Langer's insurer. Langer also did not intend to share his disability benefits with Presbyterian. Therefore, we can say that, as a result of the parties' shared intentions, Presbyterian has no direct right today to receive disability payments as a beneficiary of the alleged temporary Langer–Monarch policy.

But that is not equivalent to a blanket admission that Presbyterian has no legal interest of a *different* sort in the Langer–Monarch contract. For example, Presbyterian claims to have equitable rights to indemnification and subrogation, theories that do not depend on its status as the recipient of disability payments under an insurance policy. Presbyterian also claims to be a third-party beneficiary of the insurance contract, and as such to have the right to enforce Monarch's obligation to Langer. Presbyterian may have admitted that it was not a first-party beneficiary of the insurance policy, but it has not admitted that it had no rights to enforce the contract as an intended "donee beneficiary" of that contract.

In sum, none of Presbyterian's admissions undercut the legal premises of its theories in Counts I and II. The district court therefore erred in granting summary judgment to Monarch on these counts based solely on the doctrine of judicial admissions.

### D. *Monarch's Other Proposed Grounds for Summary Judgment*

Monarch's motion for summary judgment also contained arguments that, even apart from the admissions, given the law and undisputed facts, none of Presbyterian's theories in Counts I and II could withstand summary judgment. Although we may affirm a district court's summary judgment on grounds raised before but not

---

**26.** Presbyterian's responses to Requests Nos. 32 and 33 did contain objections to the form of the requests for admission. We believe, however, that when the district court relied on these responses in its summary judgment order, it implicitly rejected those objections. Even if not, the objections were to the imprecision of the words "owner" and "beneficiary," and Presbyterian was able to craft its answer to avoid any ambiguities by admitting, twice, that it "intended that Langer would have the exclusive right to receive disability income payments under the policy."

passed upon by that court, we choose to let the district court pass on Monarch's alternative grounds in the first instance. Accordingly, we will affirm the district court's grant of summary judgment only as to Presbyterian's claim in Count IV. We will vacate the summary judgment as to Presbyterian's other claims against Monarch and remand for further proceedings in conjunction with the remand of the *Langer* action.

## IV. MONARCH'S CROSS–APPEAL

■ Monarch appeals from the district court's decision not to impose sanctions under Federal Rule of Civil Procedure 11 against Presbyterian's counsel, Morgan, Lewis & Bockius, for submitting procedurally improper cross-claims and for executing a default judgment on those claims, despite knowledge that the claims were improper. We may review the district court's Rule 11 ruling only for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 2458–60, 110 L.Ed.2d 359 (1990). If a district court's decision is based on legal errors, that may, of course, constitute an abuse of discretion. 110 S.Ct. at 2459.

### A. *The Conduct of Presbyterian's Counsel and the District Court's Ruling*

On October 16, 1987, Langer filed his second amended complaint against both Presbyterian and Monarch. On October 27, 1987, Presbyterian answered that complaint and filed a counterclaim against Langer, but included no cross-claims against Monarch. Monarch and Langer settled shortly thereafter, and in response, on December 7, 1987, Presbyterian filed what it styled as "cross-claims" against Monarch.

As we will explain below, those "cross-claims" were procedurally improper under the Federal Rules of Civil Procedure because they were not pled as part of Presbyterian's answer to Langer's complaint. Monarch orally so informed Presbyterian's counsel the next day, but did not move to strike the "cross-claims." Presbyterian not only failed to withdraw the "cross-claims" or to reassert them in a procedurally proper fashion, but on December 31, 1987, filed a praecipe for a default judgment against Monarch for failure to answer the "cross-claims." The clerk of the district court entered the default judgment on the next business day, January 4, 1988. Monarch belatedly moved to open the default and to strike the "cross-claims." Subsequently, and even more belatedly, Presbyterian sought leave of court to amend its answer and include (properly pled) cross-claims.

The district court addressed the situation on April 5, 1988, lifting the default, striking the "cross-claims," and dismissing the claims against Monarch because Presbyterian had not asserted any valid cross-claims against Monarch. On its own motion, the court raised the subject of Rule 11 sanctions:

Here, counsel for Presbyterian filed a paper, entitled "Cross–Claims," in contravention of well-settled rules of civil procedure. Upon their being made aware of the procedural deficiencies of the document at a pre-trial conference, Presbyterian's counsel not only failed to review their position, they used this improperly-filed document as a means for having default entered against Monarch. Both the plaintiffs and Monarch have consistently taken the position that the paper filed by Presbyterian could not be valid under Fed.R.Civ.P. 7, the litigation of which consumed no small amount of valuable barristerial time.

Two months after his decision to file the paper, Presbyterian's attorney conceded in open court that the document probably had no legal basis under the Federal Rules of Civil Procedure. When asked why he had failed to follow the applicable rules, counsel responded:

I don't have any explanation for that, Judge, other than it was ... the opinion of the person who prepared it ... that it did not require a petition [for leave to amend the Answer]. After [counsel for plaintiffs and Monarch] raised [the issue] and we looked at it ... I'm of the view that it probably did.

Counsel conceded that it was he who signed the document.

The comportment of Presbyterian's counsel in this matter was unfortunate and *prima facie* calls for the assessment of Rule 11 sanctions. Not wishing to delay, however, the now-resumed progress of the underlying case toward final disposition, any Rule 11 adjudication shall be deferred until the principal cause has been brought to conclusion.

The district court thus explained its inclination to find a Rule 11 violation and order sanctions, but deferred its final decision on the matter. Upon revisiting the issue before trial (and before granting summary judgment to Monarch), the district court denied Monarch's motion for sanctions in the form of attorney fees. The court quoted its earlier opinion, but noted that Rule 11 sanctions should be awarded only in exceptional circumstances. It continued:

> Presbyterian's conduct is indeed questionable, particularly in light of counsel's above-quoted confession.
>
> However, I decline to order sanctions in this instance. Although this court in no way condones what Presbyterian's attorneys did, part of the blame for the costs incurred by the parties from this incident rests with counsel for Monarch. It is true that they informally informed Presbyterian at a pre-trial conference that they did not regard the "cross-claim" as a proper pleading. But that was a matter for the court, not Monarch, to decide. Once the purported cross-claim was filed, Monarch's attorneys could and should have filed a timely motion to strike. Instead, they stood silent, awaiting the inevitable. It was not until six weeks after the filing of the document, and over a month after default was entered, that they filed a motion to strike, at which point the parties had already spent thousands of dollars litigating the issue. If it is not laches, at least they failed to exercise their duty to mitigate damages. Because Monarch's expenses were not "reasonable expenses incurred because of the

filing," it is not entitled to attorney fees under Rule 11.

Presbyterian contends that the district court ultimately found no Rule 11 violation at all, and that that decision was no abuse of discretion. Monarch argues that the district court correctly found a Rule 11 violation, but abused its discretion in imposing no sanction. As we shall now explain, as we read the record, the district court found a Rule 11 violation, but thought that the sanction that Monarch requested was inappropriate, and satisfied itself with a reprimand. In our view, that course of action was not an abuse of discretion.

## B. *Violation of Rule 11*

First, we believe that the district court did find a Rule 11 violation. In its first ruling on this subject, the court detailed the conduct of Presbyterian's counsel, noted that the "cross-claims" were procedurally improper, observed that counsel had conceded that he and his associates had failed to inquire into the basis for the "cross-claims," and concluded that this conduct on its face violated Rule 11. In its ultimate opinion, the court did not recede from but instead reiterated its earlier criticism of Presbyterian's counsel. The only new portion was the court's finding that Monarch's counsel had failed to pursue the appropriate remedy and hence also deserved blame for the unnecessary collateral litigation. The court summarized its ruling by stating that "[b]ecause Monarch's expenses were not 'reasonable expenses incurred because of the filing,' it is not entitled to attorney fees under Rule 11." We read this as a conclusion by the district court that an award of attorney fees was not the appropriate *remedy* for Presbyterian's violation of Rule 11, rather than a finding that Presbyterian had not violated the Rule.[27]

The district court's conclusion that Presbyterian violated Rule 11 was undoubtedly

---

27. The point is somewhat academic because, as we now explain, a conclusion that Presbyterian's counsel did not violate Rule 11 would

have been clearly erroneous (and hence an abuse of discretion, see *Cooter & Gell*, 110 S.Ct. at 2458).

correct. Federal Rules of Civil Procedure 12(b) and 13(g) require that cross-claims be stated in a pleading, and under Rule 7(a) cross-claims should be contained in a defendant's answer. See, for example, *In re Cessna Distributorship Antitrust Litigation*, 532 F.2d 64, 67 & n. 7 (8th Cir.1976). Presbyterian appears to concede that its filing was procedurally improper. But, invoking a post hoc rationalization, it argues that its sin was merely one of mislabeling, because it could have, as a matter of right, amended its answer to include cross-claims against Monarch.[28]

We disagree. The issue is not whether Presbyterian could have filed an appropriately designated amended pleading at that time, but whether a reasonable attorney would have believed that the paper that Presbyterian did file was legally supportable. Under Rule 11, every paper submitted to the court must be signed, and that signature

> constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless cost of litigation.

Presbyterian's counsel appears to concede that it did not "stop, think, investigate, and research" beforehand the legal foundation of its filing, as Rule 11 requires. See *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir.1987). Good faith belief in the substantive merit of a claim does not suffice. Id. Presbyterian suggests that we have held that counsel do not deserve Rule

11 sanctions "merely for choosing the wrong characterization for their theories," *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 96 (3d Cir.1988), but that case is plainly distinguishable, for there we merely held that counsel need not affirmatively label their theories as based on good faith arguments for a change in law rather than on existing law. Presbyterian's admitted failure to inquire into the legal grounding of its "cross-claims" may not have been bad faith, but it violated Rule 11 nevertheless.

Furthermore, Presbyterian's violation of Rule 11 involved more than the filing of a mislabeled pleading. As the district court noted, Presbyterian was advised that its "cross-claims" were procedurally improper, yet not only failed to withdraw them and reassert them properly, but also caused a default judgment to be entered upon them, without notice to opposing counsel. Presbyterian could not have filed a praecipe for a default judgment in the well-founded belief that a default judgment on the "cross-claims" was proper.

## C. The District Court's Denial of Monarch's Requested Sanctions

More problematic is Monarch's claim that the district court abused its discretion by imposing no sanction at all for such a violation. If a court filing is signed in violation of Rule 11, the court

> *shall impose* upon the person who signed it, a represented party, or both, *an appropriate sanction*, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

F.R.C.P. 11 (emphasis added). Sanctions for violating Rule 11 are thus mandatory.

---

28. At the time that Presbyterian filed the "cross-claims," Langer had still not answered Presbyterian's counterclaims. Rule 15(a) allows a party to amend its pleading once as a matter of course at any time before a responsive pleading is served, or within 20 days if the party's earlier pleading required no response. Otherwise, Rule 15(a) requires leave of court or written consent of the adverse party. Presbyterian suggests that because Langer had not responded to its answer, which included counterclaims, it could have filed an amended pleading as a matter of course, without leave of court or Monarch's consent. We need not decide that hypothetical question, however, because Presbyterian did not, in fact, attempt to amend its answer until many months too late, by which time leave of court was required (and was denied).

*Lieb v. Topstone Industries,* 788 F.2d 151, 157 (3d Cir.1986). As other circuits have held, a district court can abuse its discretion by failing to award sanctions as well as by imposing them improperly. See, for example, *Figueroa–Ruiz v. Alegria,* 905 F.2d 545, 548 (1st Cir.1990); *Artco Corp. v. Lynnhaven Dry Storage Marina,* 898 F.2d 953, 956 (4th Cir.1990); *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 883–84 (5th Cir.1988) (en banc).

On the other hand, we and other courts have repeatedly emphasized the discretion of the district court in tailoring an appropriate sanction. In *Lieb,* we wrote:

> Influenced by the particular facts of a case, the court may decide that the circumstances warrant imposition of only part of the adversary's expenses or perhaps only a reprimand. In other cases, reference to a bar association grievance committee may be appropriate. The compensatory, punitive, and deterrent aspects of sanctions may have varying claims to priority, depending on the nature of the case and the violation, as well as on the standing of parties and counsel.

788 F.2d at 158. We agree with the Fifth Circuit that

> a district court must impose sanctions once a violation of Rule 11 is found, but the district court retains broad discretion in determining the "appropriate" sanction under the rule. What is "appropriate" may be a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances. Whatever the ultimate sanction imposed, the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose.

*Thomas,* 836 F.2d at 878.

In this case, the district court observed that Monarch's counsel was also partially responsible for the parties' costly litigation over the lifting of the default and the striking of the "cross-claims." That finding was well-supported and certainly not clearly erroneous. It was also no abuse of discretion to deny Monarch recompense for fees and expenses that Monarch largely could have avoided. As we have observed, the rule states that the court "shall" impose sanctions that "may" (but need not) include an order to pay the other party's expenses. *Doering v. Union County Board of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988).

Monarch suggests that the district court failed to impose any sanction, as it is required to do. While the record is not entirely clear on this point, we believe that the district court did sanction Presbyterian's counsel with a reprimand for its unprofessional conduct.[29] Reprimands are an appropriate sanction in some cases. See, for example, *Lieb,* 788 F.2d at 158; *Thomas,* 836 F.2d at 878. Although the conduct of Presbyterian's counsel was improper, under the unique circumstances of this case, the district court's choice of sanction was not an abuse of discretion.

The unique circumstances to which we refer stem from the character of this litigation. All three parties are represented by extremely able counsel from very prestigious law firms. All the parties are economically strong and none is in a position to take advantage of another's lack of resources.[30] Unfortunately, the case has devolved into bitterness and fractiousness among counsel, in particular between counsel representing Langer and Presbyterian.[31] This is apparent not only from the record in the district court, but also from these parties' contentious behavior in this court: they have deluged us with, among other things, recriminating motions to strike portions of briefs, to which were

---

29. Although the district court's opinion nominally "decline[s] to order sanctions in this case," that statement must be read in context. We believe that the district court's opinion merely denied Monarch's request for a particular type of sanction.

30. Indeed, Presbyterian's counsel could not seriously have believed that the default judgment would stick (and it did not).

31. Monarch's counsel is not subject to this opprobrium.

interposed angry answers and replies, sometimes accompanied by motions for more sanctions.[32]

Faced with imminent trial, the able district judge wanted desperately to end the "hard ball" with which he had been forced to deal during the motions and discovery stages, and, in his words, "to get on to the substance of this case." We are satisfied that, under these difficult circumstances, the choice of a stern reprimand as a sanction was not an abuse of discretion. We trust that our own reprimand will further ensure that the proceedings in the district court on remand will be characterized by good manners and professional conduct on the part of all counsel.

## V. CONCLUSION

For the foregoing reasons, the judgments of the district court for Langer and Monarch and against Presbyterian will be vacated, and the cases will be remanded to the district court for further proceedings consistent with this opinion. The district court's order with respect to Rule 11 sanctions will be affirmed. The parties shall bear their own costs on these appeals.

### SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC

Present: BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO and ROTH, Circuit Judges.

The petition for rehearing filed by Appellant, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the

court in banc, the petition for rehearing is DENIED.

DATED: July 9, 1992

---

**32.** To take but one example, Presbyterian has moved not only to strike a portion of Langer's reply brief, but also for sanctions against Langer on the ground that his reply brief misrepresented the record. Langer, of course, responded with not only a defense of his brief, but also a cross-motion for sanctions, which, of course, engendered yet another response.